# REVISED OCTOBER 25, 2001
## IN THE UNITED STATES COURT OF APPEALS

## FOR THE FIFTH CIRCUIT

───────────────

m 00-40337

───────────────

MATTHEWS SMITH, JOHN COMEAUX, JOHN LUMPKINS,
KENNETH FORD, AND DARLENE GREENE, ET AL.,

Plaintiffs-Appellees,

VERSUS

TEXACO, INC., ARAMCO SERVICES COMPANY, SAUDI REFINING, INC.,
SHELL OIL COMPANY, STAR ENTERPRISE, TEXACO, INC.,
TEXACO REFINING AND MARKETING INCORPORATED,
AND TEXACO REFINING AND MARKETING EAST, INC.,

Defendants-Appellants.

───────────────

Appeal from the United States District Court
for the Eastern District of Texas

───────────────

August 22, 2001

Before REAVLEY, SMITH, and DeMOSS,
Circuit Judges.

JERRY E. SMITH, Circuit Judge:

In this appeal brought pursuant to FED. R.
CIV. P. 23(f), the defendants challenge a class
certification. Concluding that the attempted
class does not meet the requirements of the
applicable rules, we reverse and remand.

I.

This case has its origins in race discrimina-
tion claims made against Texaco, Inc. ("Tex-
aco"), and its subsidiaries in *Roberts v. Tex-
aco, Inc.*, 979 F. Supp. 185 (S.D.N.Y 1997).

During that litigation, counsel for *Roberts* mentioned in briefs that employees of Star Enterprise ("Star") were considered members of the class; he also made representations to Matthews Smith that Star employees were included. When the *Roberts* case settled and a settlement class was certified, however, Star employees were written out of the class.[1]

A short time after the settlement was announced, Smith obtained a state court temporary restraining order prohibiting Star and Texaco from removing or destroying documents; media reports had suggested that they were destroying evidence.[2] At this point, the statute of limitations already had expired.

Star then removed the case to federal court. After a hearing, the district court entered preliminary injunctions and document preservation orders that Star and Texaco appealed. This court affirmed.

The plaintiffs have filed a series of amended complaints, including *inter alia,* claims against Texaco based on agency principles and stemming from its part ownership of Star (through its wholly-owned subsidiaries Texaco Refining and Marketing Incorporated ("TRMI") and Texaco Refining and Marketing East ("TRMI East")). TRMI and its wholly-owned subsidiary TRMI East were included, based on the latter's role as joint venturer in Star. Saudi Refining Incorporated ("SRI") was joined as the other joint venturer in Star. Finally, Aramco Services Company ("ASC") was joined because it owns SRI.

Plaintiffs, individually and as representatives of a class of approximately two hundred other salaried black employees, allege that defendants discriminated on the basis of race in violation of title VII of the Civil Rights Act of 1964, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 2000e, and the Civil Rights Act of 1871, as amended by the Civil Rights Act of 1991, 42 U.S.C. § 1981. The plaintiffs assert discrimination in promotions, compensation, and other benefits and privileges of employment throughout Star's facilities in various states.

The allegations involve Star's evaluation, job posting, and compensation/pay grade systems and promotion practices. Star and Texaco also are accused of creating or permitting the creation of a hostile work environment for black employees.[3] The claims focus on the policies' subjectivity, which allegedly allows defendants to apply the facially-neutral practices in a discriminatory manner. Plaintiffs seek monetary damages including, but not limited to, compensatory and punitive damages. After a hearing, the district court certified the following class:

> All African-American employees of Star Enterprise, at any time from March 23, 1991 to the present who have held or who have tried to obtain, a managerial, supervisory, or professional salaried position, and who have been, continue to be, or may in the future be adversely affected by Star's alleged racially discriminatory employment and

---

[1] Star was found not to meet the definition of a Texaco subsidiary as defined by the agreement.

[2] *See Smith v. Texaco, Inc.*, 951 F. Supp. 109 (E.D. Tex.), *aff'd*, 117 F.3d 1417 (5th Cir. 1997) (table) (unpublished).

[3] To reduce repetition, we write predominantly with regard to the particular evaluation policy ("PMP"). Where necessary, we include specific reference to the other challenged practices.

practices. The class does not include any hourly individuals who have tried to obtain salary positions.

## II.

### A.

A district court maintains substantial discretion in determining whether to certify a class. *See Jenkins v. Raymark Indus., Inc.*, 782 F.2d 468, 471-72 (5th Cir. 1986). We recognize the essentially factual basis of the certification inquiry and defer to the district court's inherent power to manage and control pending litigation, so we review certification decisions only for abuse of that discretion. *See Pegues v. Miss. State Employment Serv.,* 699 F.2d 760, 763 (5th Cir. 1983). Nonetheless, "[a] district court by definition abuses its discretion when it makes an error of law." *Koon v. United States*, 518 U.S. 81, 99-100 (1996). Whether the court applied the correct legal standard is a question subject to *de novo* review. *See Forbush v. J.C. Penney Co.,* 994 F.2d 1101, 1104 (5th Cir. 1993).

### B.

As a guide, we compare the causes of action before delving into the specifics of this case. Class actions brought under title VII typically proceed under two theories, disparate impact[4] and systemic disparate treatment[5];

---

[4] The disparate impact model of title VII liability is based on section 703(a)(2) of title VII, 42 U.S.C. § 2000e-2(a)(2), which forbids an employer to "limit, segregate, or classify" employees "in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee" because of race or sex. Disparate impact claims, recognized in *Griggs v. Duke Power Co.,* 401 U.S. 424 (1971), do not require proof of intent to discriminate. Plaintiffs must identify spe-
(continued...)

[4](...continued)
cific practices as being responsible for any observed disparities, *see Johnson v. Uncle Ben's, Inc.,* 965 F.2d 1363, 1367 (5th Cir. 1992), and must present a systemic analysis of those employment practices to establish their case, *see Black Fire Fighters Ass'n v. City of Dallas,* 905 F.2d 63, 63 (5th Cir. 1990).

Disparate impact claims may be brought by individual plaintiffs or by a class. In either case, the evidence will focus on the degree of statistical disparity between protected and non-protected workers in regard to employment or promotion.

[5] The disparate treatment model is based on section 703(a)(1) of title VII, 42 U.S.C. § 2000e-2(a)(1), which provides that it is an unlawful employment practice "to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment" because of race or sex. The *prima facie* elements of a claim for disparate treatment are (1) that the plaintiff is a member of a protected class under the statute; (2) that he applied and was qualified for a job or promotion for which his employer was seeking applicants; (3) that, despite his qualifications, he was rejected; and (4) that afterwards the position remained open, and the employer continued to look for candidates with plaintiff's qualifications. *See McDonnell Douglas Corp. v. Green,* 411 U.S. 792 (1973).

Disparate treatment claims can be brought as class actions, as well. Plaintiffs must show a "pattern or practice" of discrimination by the employer, i.e., that "racial discrimination was the company's standard operating procedureSSthe regular rather than the unusual practice." *Int'l Bhd. of Teamsters v. United States,* 431 U.S. 324 (1977). Proving a pattern or practice is necessary to establishing a *prima facie* case in a disparate treatment class action: "Proving isolated or sporadic discriminatory acts by the employer is in-
(continued...)

plaintiffs advance both. The disparate impact theory is used to challenge a facially-neutral employment policy that affects a protected employee class more harshly. *Pouncy v. Prudential Ins. Co. of Am.,* 668 F.2d 795, 799 (5th Cir. 1982). Disparate impact cases in particular, which challenge specific, facially-neutral policies with proof of statistical disparities despite uniform application, implicate class-based claims.

The disparate treatment theory focuses on whether the employer engaged in a "pattern or practice" of intentional discrimination, that is, whether discrimination was the employer's standard operating procedure rather than a sporadic occurrence. *See Teamsters,* 431 U.S. at 336. We previously have upheld class action certifications involving both causes of action.[6]

Class actions in which an employer engaged in a pattern or practice of intentional discrimination ordinarily are handled in bifurcated proceedings imposing different burdens of proof in the respective phases. *See Shipes v. Trinity Indus.,* 987 F.2d 311, 318 (5th Cir. 1993). During the first or "liability" stage, plaintiffs seek to prove a pattern or practice of invidious class-based discrimination. *See id.* When successful, individual class members benefit from a presumption of equitable pay (i.e., back pay), their entitlement to which is determined during the second or "remedial" stage.

To obtain back pay, class members need only prove that they were denied employment opportunities and the extent of their loss; the burden then shifts to the employer to demonstrate that the denial was for legitimate reasons. *See Richardson,* 709 F.2d at 1021; *see also Teamsters,* 431 U.S. at 362. Although this final determination typically involves individual hearings, *see Johnson v. Goodyear Tire & Rubber Co.,* 491 F.2d 1364, 1375 (5th Cir. 1974), courts, until 1991, streamlined the process by employing special masters, *see* NEWBERG & CONTE, NEWBERG ON CLASS ACTIONS §§ 24.119-24.121 (3d ed. 1992).

The Civil Rights Act of 1991 fundamentally changed the procedures and remedies available under title VII. *Inter alia*, the act now permits plaintiffs to recover, in cases raising individual disparate treatment and pattern or practice claims, compensatory and punitive damages for unlawful intentional discrimination. *See* 42 U.S.C. § 1981a(a)(1). Compensatory damages include relief for "future pecuniary losses, emotional pain, suffering, inconvenience, mental anguish, loss of enjoyment of life, and other nonpecuniary losses. § 1981a(b)(3). The act also allows punitive damages if the employer discriminated with malice or with reckless indifference to the federally protected rights of an aggrieved individual. § 1981a(b)(1)(2). Damages are capped at $300,000 per plaintiff. *See* § 1981a(b)(3). Finally, in all cases in which a plaintiff seeks compensatory and punitive damages, either party may demand a jury. *See* § 1981a(c).

---

[5](...continued) sufficient to establish a prima facie case . . . ." *Cooper v. Fed. Reserve Bank,* 467 U.S. 867, 875-76 (1984).

[6] *See, e.g., Richardson v. Byrd,* 709 F.2d 1016 (5th Cir. 1983); *Robinson v. Union Carbide Corp.,* 538 F.2d 652 (5th Cir. 1976); *Pettway v. Am. Cast Iron Pipe Co.,* 494 F.2d 211 (5th Cir. 1974).

### C.

Under FED. R. CIV. P. 23, the various categories of class actions, with their divers requirements, represent a balance struck in each case between the need and efficiency of a class action and the interests of class members to pursue their claims separately or not at all.[7] Class actions are categorized according to the nature or effect of the relief sought.

Relevant to this case are the rules governing rule 23(b)(2) and (b)(3) classes. The rule 23(b)(2) class action was intended for cases in which broad, class-wide injunctive or declaratory relief is necessary. *See Holmes v. Cont'l Can Co.,* 706 F.2d 1144, 1155 n.8 (11th Cir. 1983). The rule 23(b)(3) class action exists to dispose of all other cases in which a class action would be "convenient and desirable," including those involving large-scale, complex litigation for money damages. *Amchem*, 521 U.S. at 516.[8] Pairing the respective rule 23 categories with specific kinds of relief reflects a concerted effort to respect the variety among class-member interests, which often depends on the natures of the injuries alleged and relief sought.

### D.

The four prerequisites of Rule 23(a) are that

(1) the class be so numerous that joinder of all members is impracticable;

(2) there be questions of law or fact common to the class;

(3) the claims or defenses of the representative parties be typical of the claims or defenses of the class; and

(4) the representative parties will fairly and adequately protect the interests of the class.

Rule 23(a); *accord Amchem*, 521 U.S. at 613.

### 1.

A class must be so numerous that "joinder of all members is impracticable." Rule 23-(a)(1). To meet this requirement, the class representatives need show only that it is difficult or inconvenient to join all members of the class. *See Phillips v. Joint Legislative Comm.,* 637 F.2d 1014, 1022 (5th Cir. Unit A Feb. 1981). Defendants do not challenge the numerosity of the class.

### 2.

The test for commonality is met "where there is at least one issue, the resolution of which will affect all or a significant number of the putative class members. *Lightbourn v. County of El Paso*, 118 F.3d 421, 426 (5th Cir. 1997). While the commonality hurdle is not particularly high, a plaintiff must go beyond merely describing issues at the highest level of generality.[9] In *Mullen v. Treasure*

---

[7] *See Amchem Prods., Inc. v. Windsor,* 521 U.S. 591 (1997); *United States Parole Comm'n v. Geraghty,* 445 U.S. 388 (1980).

[8] *See also Penson v. Terminal Transp. Co.,* 634 F.2d 989, 993 (5th Cir. Unit B Jan. 1981) (citing rule 23 (advisory committee notes)).

---

[9] *See, e.g.*, *Gen. Tel. Co. v. Falcon*, 457 U.S. 147 (1982) ("We cannot disagree with the proposition underlying the across-the-board ruleSSthat racial discrimination is by definition class discrimination. But the allegation that such discrimination has occurred neither determines whether a class action may be maintained in

(continued...)

*Chest Casino*, 186 F.3d 620 (5th Cir. 1999), commonality was present, because the putative class members would assert claims for negligence under the Jones Act and for operating an unseaworthy vessel. The court found that the common issues pertaining to the theories of liabilitySSi.e., the class members' status as Jones Act seamen, the negligence of Treasure Chest, and the unseaworthiness of the CasinoSSwere independently sufficient to establish commonality.[10]

In *Allison v. Citgo Petroleum Corp.,* 151 F.3d 402, 408 (5th Cir. 1998), the court, confronting a class of roughly one thousand persons, who alleged similar causes of action as these plaintiffs (disparate treatment and impact) and sought similar remedies (injunction compensatory and punitive damages) noted, without challenge, that the class met the rule 23 requirements. The similarities between the *Allison* plaintiffs and the current plaintiffs strongly suggest that the district court did not abuse its discretion.

Plaintiffs allege that Star used a defective

evaluation policy: the defect being both that it had a disparate impact and that it was employed with discriminatory intent.[11] Although these are broad claims, they surpass the low threshold of commonality. Because there is at least one issue the resolution of which will affect all or a significant number of class membersSSwhether the policy has a disparate impact on black employeesSSthe commonality test is met.[12]

3.

Like the test for commonality, the test for typicality is not demanding. It "focuses on the

---

[9](...continued)
accordance with Rule 23 nor defines the class that may be certified.").

[10] The dissent charges that "[t]oday's decision and *Allison* cannot be reconciled with *Mullen*." *Mullen* was decided after *Allison*. Under our rule of orderliness, the earlier decision controls in the event of inconsistency. *Teague v. City of Flower Mound, Tex.*, 179 F.3d 377, 383 (5th Cir. 1999). Both we and the *Mullen* panel are and were bound by the holdings in *Allison*, which, in any event, are sound. It is apparent that the dissent's real complaint is with *Allison*, which is now well established law in this circuit after we declined to reconsider it en banc. *See Allison*, 151 F.3d at 434 (denying rehearing en banc).

[11] The plaintiffs do not argue that the policy was adopted with overall discriminatory intent. Had they done so, their disparate treatment claim would have been significantly less complex. We note, without adopting, that at least "one court had held that class certification under a disparate treatment theory requires an allegation that the granting of discretion was motivated by discriminatory intent. *See Reap v. Cont'l Cas. Co.*, 199 F.R.D. 536 (D.N.J. 2001) (disallowing certification under a disparate treatment theory in the absence of a specific allegation that the company intended to use the policy to discriminate).

Plaintiffs argue that the policy was employed in certain individual cases to discriminate. Additionally, at least three of the named plaintiffs have testified that the PMP was fair and not discriminatory toward them. Although some might see this as a minor challenge to the "adequacy" of these named plaintiffs, such testimony undermines a claim that the policy was adopted with discriminatory intent. Of course, Star still could have adopted the policy with such an intent, but certain supervisors opted not to discriminate. Plaintiffs have not made this claim, however.

[12] The test does not appear to require predomination, just commonality.

similarity between the named plaintiffs' legal and remedial theories and the theories of those whom they purport to represent," *Lightbourn*, 118 F.3d at 426, and is satisfied when the resolution of common questions affects all or a substantial number of class members, *Shipes*, 987 F.2d at 315. It is not necessary that each class member suffer the same degree of harm. Here, plaintiffs assert similar claims: They do not argue that one was trespassed against while another was the object of discrimination. The class purports to consist of similarly-situated black employees who were exposed to the same policies. That the time period of exposure may differ, or that some were less affected by the policy, would not necessarily prevent a finding of typicality. It might, however, affect other considerations, such as damage levels or predominance.

4.

Differences between named plaintiffs and class members render the named plaintiffs inadequate representatives only where those differences create conflicts between the named plaintiffs' and the class members' interests.[13] Star challenges the district court's adequacy determination on the basis that some of the class members have supervised other class members,[14] and several of the named plaintiffs have claimed that the PMP was applied fairly to them.

Star points to *Gen. Tel. Co. v. Falcon*, 457 U.S. 147 (1982), in which the Court decertified a class after deciding that the named plaintiff, who claimed to suffer from an intentional act of discrimination, sought to represent a class that proceeded on a disparate impact theory.[15] The Court held that the individual and class claims should have been tried separately, because the "evidentiary approaches to the individual and class claims were entirely different." *Id.* at 159. Combining the two claims would not advance "the efficiency and economy of litigation which is a principal purpose of the [class action] procedure." *Id.* (quoting *Am. Pipe & Constr. Co. v. Utah*, 414 U.S. 538, 553 (1974)).

Because several of the named plaintiffs

---

[13] *See Jenkins,* 782 F.2d at 472 (considering, in evaluating adequate representation requirement, whether named plaintiffs have "an insufficient stake in the outcome or interests antagonistic to the unnamed members"); s*ee also Mullen,* 186 F.3d at 626 (noting that while the differences described by defendant might create variances in the ways that the named plaintiffs and class members prove causation and damagesSSa lifelong non-smoker may have less difficulty in proving that the casino's conditions caused her asthma than will a smoker, whose claim is thus subject to a defense of contributory negligenceSSthey did not affect the alignment of their interests).

[14] This type of challenge seems to fail where both promotional and hiring discrimination is alleged. In those cases, the interests of the supervisors are co-extensive with those of the other employees. *See Rossini v. Ogilvy & Mater, Inc.*, 798 F.2d 590 (2d Cir. 1986). Even so, we assume the supervisors will argue that they did not act with discriminatory intent toward others when applying the PMP. Again, this difference means that unless plaintiffs prove that Star adopted the program with specific-discriminatory intent, any disparate treatment claims will depend on proving specific acts by specific supervisors.

[15] The district court found that the named plaintiff had been discriminated against in promotion, but not hiring, while the class had been discriminated against in hiring, but not promotion. This converse relationship was the source of the Court's disagreement with the certification decision. *Gen. Tel.*, 457 U.S. at 152-59.

assert that they always have received good marks on their PMP's, it seems at first glance that *General Telephone* should apply. Chief Justice Burger's separate opinion tempers such application, however: He notes that in *General Telephone* there was no allegation that those who made the hiring decisions were the same persons who made the promotion decisions. *Id.* at 162 n.* Our case differs; the named plaintiffs' claim that Star, at the organizational level, engaged in discriminatory practices is equivalent to the allegation described by Chief Justice Burger. Up to this point, we find no abuse of discretion.

### E.

Certification under rule 23(b)(2) requires plaintiffs to show that "the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole." Rule 23(b)(2). This includes a requirement that claims for injunctive relief predominate over claims for monetary relief. *Id.* (advisory committee notes). Injunctive relief predominates where the monetary relief is "incidental"[16] to the injunctive relief, but does not predominate where the monetary relief depends on the varying circumstances and merits of each individual's case, making it less of a group remedy. *Allison,* 151 F.3d at 410-13.

The comparative nature of the predomination inquiry means that seemingly minor differences between or among causes of action or damages sought can produce dramatically different results. For instance, if the plaintiffs had sought only injunctive and declaratory relief, this case could have been certified under rule 23(b)(2); there would have been no money damages to predominate. It is also plain that the presence of any amount of money damages does not result in a *per se* finding of predomination. Finally, considering *Allison* and rule 23(b)(2)'s formulation, the instant claims could not have been certified under that paragraph, because compensatory and punitive damages predominate over injunctive/declaratory relief.

Before addressing the issues relevant to the rule 23(b)(3) certification, two points deserve attention. First, we address Star's protestation that injunctive relief is not available because Star is no longer a going concern. Even though Star has been reorganized and reconstituted among new partners under a new name ("Motiva"), this fact alone does not block an injunction against practices that have a disparate impact on black employees in the current organization. To see the corporate change as a bar to enjoining a discriminatory practice would create an end-run around the statute.[17]

Second, contrary to the defendants' protestations, we have allowed and even have required notice in rule 23 (b)(2) class actions in which equitable monetary claims were at stake. *See Johnson v. Gen. Motors Corp.,* 598

---

[16] By "incidental," we mean that "damages that flow directly from liability to the class as a whole on the claims forming the basis of the injunctive or declaratory relief. . . . Ideally, incidental damages should be only those to which the class members automatically would be entitled once liability to the class (or subclass) as a whole is established." *Allison,* 151 F.3d at 415 (citations omitted).

[17] *See NLRB v. Fabsteel Co.*, 587 F.2d 689 (5th Cir. 1978) (requiring a successor to reinstate a group of twenty-two strikers whom its predecessor had fired illegally.).

F.2d 432, 438 (5th Cir. 1979). Additionally, *Allison* recognized that providing rule 23(b)(2) class members with the procedural safeguards of notice and opt-out can permit civil rights class actions to proceed under that rule. *Id.* at 418. Therefore, the district court did not abuse its discretion when it granted the plaintiffs an opt-out procedure under rule 23(b).

### F.

Rule 23(b)(3) permits certification of a class action otherwise meeting the requirements of rule 23(a) where

> the court finds that the questions of law or fact common to the members of the class predominate over any questions affecting only individual members, and that the class action is superior to other methods for a fair and efficient adjudication of the controversy. The matters pertinent to the findings include: (A) the interests of the members of the class in individually controlling prosecution or defense of separate actions; (B) the extent and nature of any litigation concerning the controversy already commenced by or against members of the class; (C) concentrating the litigation of the claims in a particular forum; (D) the difficulties likely to be encountered in management of a class action.

Rule 23(b)(3). The two main inquiries are whether common issues predominate over individual issues and whether the class action is a superior adjudicatory scheme.

### 1.

The predominance inquiry involves a comparison of the issues common among the class members and the issues individual to them. This analysis remains unchanged whether a class is certified under one or more sections of rule 23(b). The inquiry's constancy serves as an important limitation on the use of bifurcation by preventing a district court from manufacturing predominance through the "nimble use" of rule 23(c)(4). *Castano v. Am. Tobacco Co.*, 84 F.3d 734, 745 n.21 (5th Cir. 1996).

Therefore, the cause of action, as a whole, must satisfy rule 23(b)(3)'s predominance requirement. *Id.* Once that requirement is met, rule 23(c)(4) is available to sever the common issues for a class trial.[18] To read the rule not

---

[18] This "as a whole" requirement suggests some interesting permutations. Any change in the composition of liability issues or damages sought would require a new accounting to determine whether common or individual issues predominate. For example, a disparate impact claimSSa non-individualized claimSSwould serve as counterweight to the individual inquiries necessary to determine compensatory or punitive damages. Another outcome would result if the plaintiffs had not requested punitive damages.

Because the predominance test is sensitive to each variance in legal theories or remedies sought, it prevents the establishment of a *per se* rule that would prohibit title VII claims' being tried as class actions. We reject defendants' characterization of *Allison* as establishing such a *per se* rule. *See id.* (citing *In re N. Dist. of Cal. Dalkon Shield IUD Prods. Liability Litig.*, 693 F.2d 847, 856 (9th Cir. 1982) (balancing severed issues against the remaining individual issues); *Jenkins v. Raymark Indus., Inc.*, 109 F.R.D 269, 278 (E.D. Tex. 1985) (comparing state-of-the-art defense to individual issues of exposure and degree of injury in a class action certified only on the common issue of state-of-the-art defense), *aff'd*, 782 F.2d 468 (5th Cir. (continued...)

9

as a housekeeping rule, but instead as allowing a court to pare issues repeatedly until predomination is achieved, would obliterate rule 23(b)(3)'s predominance requirement, resulting in automatic certification in every case in which any common issue exists, a result the drafters of the rule could not have intended.

With this limitation in mind, we apply the predominance test to the instant facts. We first consider the nature of compensatory damages, borrowing from *Allison*:

> The very nature of these damages, compensating plaintiffs for emotional and other intangible injuries, necessarily implicates the subjective differences of each plaintiff's circumstances; they are an individual, not class-wide, remedy. The amount of compensatory damages to which any individual class member might be entitled cannot be calculated by objective standards. Furthermore, by requiring individualized proof of discrimination and actual injury to each class member, compensatory damages introduce new and substantial legal and factual issues.

*Allison*, 151 F.3d at 417. Compensatory damages, then, must be placed on the "individual" side of the equation, counseling against a finding of predominance. To do otherwise would allow a class action to "degenerate in practice into multiple lawsuits separately tried. *Castano,* 84 F.3d at 745 n.19 (citing rule 23 (advisory committee notes)).

Plaintiffs, however, point to *Warnell v.*

*Ford Motor Co.*, 189 F.R.D. 383 (N.D. Ill. 1999), in which the court, after acknowledging that a sexual harassment claim, by nature, is highly individualized, certified the class under rule 23(b)(2) and (3). *Warnell* is inapposite on the issue of compensatory damages, for that court focused on the legal standards that govern sexual harassment liability. Reference to *Warnell does* help, however, to demonstrate the necessity of considering liability and damages issues separately during the predominance inquiry.

Plaintiffs' reliance on *Warnell* as a means of avoiding *Allison* is misplaced. *Warnell* does not engage *Allison* until it discusses certification under rule 23(b)(2), and then only to pronounce that the holding regarding whether compensatory damages are incidental to injunctive relief is *dictum*. *See Warnell*, 189 F.R.D. at 389. Moreover, *Warnell*'s characterization of *Allison*'s language has been superseded in its own circuit. *In Lemon v. Int'l Union of Operating Eng'rs*, 216 F.3d 577 (7th Cir. 2000), the court, relying on *Allison*, vacated a rule 23(b)(2) class certification where the class had requested compensatory damages, reasoning that the damages were not incidental to the injunctive relief requested. *Lemon*, 216 F.3d at 577. By doing so, the *Lemon* court overruled *Warnell.*

We next consider whether punitive damages require an individual inquiry. First, punitive damages are not available for disparate impact claims. In *Kolstad v. Am. Dental Ass'n*, 527 U.S. 526, 534 (1999), the Court emphasized that there must be malice or reckless indifference that is directed at the federally-protected rights of an aggrieved individual. *Id.* Specifically, the Court, *id.* at 534-35, considered whether, for punitive damages, there must be egregious misconduct

---

[18](...continued)
1986).

10

(in addition to the mere existence of discriminatory intent). In deciding that "intent determines whether remedies are open," the Court highlighted the subjectivity necessary for liability. *Id.* at 535-36.

Punitive damages have not been assessed merely on a finding that the defendant engaged in a pattern or practice of discrimination. Such a finding establishes only that there has been general harm to the group and that injunctive relief is appropriate. *See Price Waterhouse v. Hopkins,* 490 U.S. 228, 266, (1989) (O'Connor, J., concurring in the judgment). The Court's precedent supports the view that an individualized inquiry is necessary to determine liability for punitive damages in the title VII context, at least where, as here, there are a series of decisions made by various personnel.

Further support comes from this circuit's caselaw. In *Patterson v. P.H.P. Healthcare Corp.*, 90 F.3d 938, 940 (5th Cir. 1996), a title VII case, we held that compensatory and punitive damages no longer could be presumed from a mere violation of a plaintiff's rights; a degree of specificity is required to support a damage award. Our subsequent jurisprudence is worth review.

In *Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 156 F.3d 581 (5th Cir. 1998), we initially receded from that part of *Patterson* that had discussed vicarious liability. *Deffenbaugh-Williams*, however, was vacated for rehearing en banc and was reinstated in part by the en banc court, which, notably, did not reinstate the discussion of punitive damages. *See Deffenbaugh-Williams v. Wal-Mart Stores, Inc.*, 182 F.3d 333 (5th Cir. 1999) (en banc). Before this court decided *Defenbaugh-Williams* en banc, we decided *Allison*, which

cited *Patterson* for the proposition that "recovery of compensatory and punitive damages in title VII cases requires individualized and independent proof of injury to, and the means by which discrimination was inflicted upon, each class member." *Allison*, 151 F.3d. at 419. Next in line was *Kolstad*, discussed *supra*.

Finally, it is helpful to consider *Hardin v. Caterpillar, Inc.*, 227 F.3d 268 (5th Cir. 2000), in which this court faced the question whether a district court had erred in refusing to submit an issue of punitive damages to the jury. The court granted a new trial after determining that the punitive damages issue could not be tried alone, because the difficulty of doing so inhered in the very nature of the jury's decisionmaking:

> A jury deciding whether to award punitive damages and their amount responds to the evidence of intentional acts essential here to the underlying finding of liability. But intentional acts span a range of intensity, purpose, and foreseeability, a range that oscillates with the perceived level of emotional injury and its appropriate compensation. Many legal systems reflect this linkage of actual and punitive damages in locating caps for punitive awards. It is no answer that liability and damages here come in distinct legal capsules, because it is equally true that their expression in a verdict is a meld, a phenomenon providing essential anchors and focus to the open-ended character of punitive damages .

*Id.* at 272. The court remarked that it was not deciding that issues of intent, of compensatory damages, and of punitive damages are inseparable as a matter of law in all cases. *See*

11

*id.*

The gravamen of *Hardin* seems to be that although there is no bright line, it is only in unlikely situations that compensatory and punitive damages will not be intertwined. The court's description of the various factors suggests that an individual inquiry is necessary to resolve punitive damages in cases involving discrimination; *Hardin* offers hearty language supporting *Patterson*'s principles.

Additionally, language in *Allison* suggests that if punitive damages ever are available in a discrimination suit on a class-wide basis, without individualized proof, the instant allegations do not meet the requirements: Plaintiffs do not allege that the entire class is subjected to the *same* discriminatory act or *same* series of acts that would justify punitive damages. Rather, here as in *Allison*, the plaintiffs challenge broad policies and practices that were applied in a non-standard way. The named plaintiffs cannot hope to show, except by individual proof, that the policies as applied in each instance occurred with the required level of "malice or reckless indifference to the federally-protected rights of the aggrieved individual."[19]

_____

[19] To the extent that the district court contended that the common issue was the existence of discriminatory practices, such a contention does not demand the conclusion that every act was committed with the requisite intent to award punitive damages. In fact, in light of testimony by some of the named plaintiffsSSwho said they received good PMP marksSSthe claim cannot be that the PMP was, in each case, applied with the necessary intent. Add to this the complication that multiple policies are condemned.

There also can be little doubt that not all
(continued...)

The difference can be appreciated by considering the following: A supervisor announces to the workforce that at 5:00 that evening, each white employee will be laid off. This act is singular, and it can be assumed that the defendant acted with the same level of intent as to each white employee.[20] In contrast, the requisite intent can be gleaned only from the actions of individual supervisors applying the policy. Thus, the punitive damage inquiry is placed on the "individual issue" side of the predominance equation, keeping in mind that punitive damages are available only for the disparate treatment claim.[21]

Plaintiffs point to two asbestos cases[22] to support their claim that punitive damages can be determined on a class-wide basis. In those mass-tort cases, this circuit approved the use

_____

[19](...continued)
plaintiffs will have suffered damage from each of the alleged policies in the same manner, or perhaps even suffered damage from the same number of policies. These factors place the award of punitive damages outside the realm in which multipliers might be appropriate.

[20] Naturally, compensatory damages still would require proof on an individual basis.

[21] In his well-written dissent, Judge Reavley charges that in the wake of this opinion, "there can be no class action where the class members seek individual personal damages beyond those incidental to a claim for equitable relief." The above hypothetical shows the flaw in that criticism; the dissent does not address it. Nor does it address the basic framework of our analysis, which is that the predominance inquiry must consider the variations in theories of liability *and* the variations in proof of damages for *each* plaintiff.

[22] *Jenkins* and *In re Fibreboard*, 893 F.3d 706 (5th Cir. 1990).

12

of a multiplier to determine the punitive damages amount. We do not revisit those holdings, which are binding circuit precedent; instead, we rely on *Kolstad*'s language and the statutory requirement that the defendants' intent be directed against an aggrieved individual.[23]

The district court also attempted to distinguish the instant plaintiffs from the *Allison* plaintiffs by claiming that the former group is more homogeneous than the latter. The obstacle to this approach is that it fails to recognize that the relevant homogeneity regards the damages sought.

In *Allison*, the individual nature of the damage proof overwhelmed the common issues.

---

[23] The dissent argues that in adhering to *Allison*, we "fail to follow" controlling circuit precedent," i.e., *Jenkins*. In fact, we are bound to apply both *Jenkins* and *Allison*. The *Allison* court took full account of *Jenkins*, citing it several times, so we are informed not only by *Jenkins* but by *Allison*'s reading of *Jenkins*.

We also are at a loss to understand why we should ignore "language" in the intervening Supreme Court decision in *Kolstad*, which, as we have said, emphasized the statutory language in the 1991 amendment to the effect that punitive damages depend on "*malice or . . . reckless indifference to the . . . rights of an aggrieved individual.*" *Kolstad*, 527 U.S. at 534 (quoting 42 U.S.C. § 1981a(b)(1)) (Supreme Court's emphasis). Judge Reavley's insistence that we should adopt, as binding, his broad reading of *Jenkins*, even in the wake of *Kolstad*, runs afoul of the maxim that "the rule of orderliness has little persuasive force when the prior panel decision at issue conflicts with a Supreme Court case to which the subsequent panel decision is faithful." *Kennedy v. Tangipahoa Parish Library*, 224 F.3d 359, 370 n.13 (5th Cir. 2000).

The district court's observation spoke to whether the grounds for liability were similar, but that the plaintiffs' liability cases are similar does not alter the nature of the damage inquiry, save the example provided above. Were these plaintiffs identicallySSas opposed to similarlySSsituated, a court might be able to forego individual damage inquiries; but that is not the case.[24]

Another concern with the district court's approach to distinguishing the plaintiff sets is that the *Allison* court specifically rejected the existence of a plant-wide discriminatory practice as an "overarching issue" that would counterbalance the individual inquiry necessary to determine compensatory and punitive damages. *Allison*, 151 F.3d at 420. The district court departs directly from *Allison* on this point. Just as in *Allison*, the plaintiffs' claims for compensatory and punitive damages will focus almost entirely on facts and issues specific to individuals rather than to the class as a whole.

2.

The superiority inquiry looks to see whether the class action is truly a more efficient means of resolving the legal issues. The class action suit was designed to improve judicial economy. *See id.* at 410. Based on the cause of action involved here, our inquiry is

---

[24] Even when considering damages, we must keep in mind that the instant liability issues are not ones as to which the proof involves the "same event"; instead, they are cases involving the actions of different actors. If Star had adopted the PMP with the specific intent to discriminate, the necessary proof would be potentially much more common to each plaintiff. This would provide support for a rule 23(b)(3) certification and perhaps could be another example of a counterweight to the individual-damage inquiry.

constrained by the Seventh Amendment.[25]

Title VII forbids compensatory and punitive damages for disparate impact claims, *see* § 1981a(a)(1), limiting to the pattern or practice claim the Seventh Amendment right to a jury trial, *see* § 1981a(c).[26] Once the right to a jury attaches to a claim, however, it extends to all

---

[25] This analysis closely tracks our opinion in *Allison*.

[26] In a supplemental letter filed pursuant to FED. R. APP. P. 28(j), plaintiffs call our attention to *Cooper Indus., Inc., v. Leatherman Tool Group, Inc.*, 121 S. Ct. 1678 (2001), which was issued after oral argument in this case. In *Cooper*, which is not a title VII case, the Court held that appellate courts should apply a *de novo* standard when reviewing district court's determinations of the constitutionality of a punitive damage award.

The Court contrasted the nature of actual and punitive damages, stating that the former presents questions of historical predictive fact, while the latter is "not really a 'fact' 'tried' by the jury." *Id.* at 1686. (citation omitted). This distinction led the Court to determine that appellate review of whether a punitive damage award is consistent with due process does not implicate Seventh Amendment concerns. *Id.* at 1686-87.

Absent Congress's 1991 grant of a right to jury trial for punitive damages under title VII, *Cooper* might support the placement of punitive damages on the common-issue side of the equation. Nothing in *Cooper* suggests, however, that the Court was invalidating the Civil Rights Act of 1991. Accordingly, *Cooper* does not limit the ability of Congress to provide, by statute, the right to a jury in cases in which the Seventh Amendment does not otherwise require it. Additionally, *Hardin*, 227 F.3d at 272, explains that it is the interrelatedness of compensatory and punitive damages that requires that they be determined together.

factual issues necessary to resolve that claim. *See Beacon Theatres, Inc. v. Westover,* 359 U.S. 500, 510-11 (1959). The Seventh Amendment also requires submission to a jury of all factual issues common to legal and equitable claims, for decision on the legal claims before a final court determination of the equitable claims.[27] Thus, under § 1981a, the right to a jury extends to all factual issues necessary to determine liability on the pattern or practice claim and the quantum of compensatory and punitive damages. The inseparability of the plaintiffs' disparate treatment and disparate impact claims, on the one hand, from their specific remedy requests, on the other, thus presents a difficult hurdle for class certification.[28]

Because the same employment policies and practices are challenged under both claims, there are overlapping issues. First, an essential factual element of both claims is a finding that the challenged employment practice caused each class member to suffer an adverse employment action. To resolve either claim, the trier of fact must determine whether each

---

[27] *See Roscello v. Southwest Airlines Co.,* 726 F.2d 217, 221 (5th Cir. 1984) (citing *Dairy Queen, Inc. v. Wood,* 369 U.S. 469, 479 (1962)).

[28] The dissent relies on excerpts from the legislative history of the 1991 amendments to suggest that they were "enacted to provide additional remedies for victims of discrimination by larger employers." We avoid normative comments on the purpose of the amendments and focus, instead, on the text of the statute and the caselaw interpreting it, avoiding speculation on whether Congress had in mind any restrictive effect on the availability of class actions. Instead, we abide by *Allison*, which states that "[i]n the class action context, the changes to Title VII are not inconsequential." *Allison*, 151 F.3d at 410 (footnote omitted).

class member was even in a position to be affected by the challenged employment practice (*e.g.,* whether each member applied for an open job). Furthermore, as explained in *Segar v. Smith,* 738 F.2d 1249, 1268-70 (D.C. Cir. 1984), significant overlap of factual issues is almost inevitable whenever disparate impact and pattern or practice claims are joined in the same action:

> [T]he employer's effort to rebut the pattern or practice claim by articulating a legitimate nondiscriminatory explanation may have the effect of putting before the court all of the elements of a traditional disparate impact case. By its explanation of an observed disparity the employer will typically pinpoint an employment practice (or practices) having a disparate impact on a protected class. And to rebut plaintiffs' case the employer will typically be required to introduce evidence showing that the employment practice in fact caused the observed disparity. In this situation, between the plaintiffs' prima facie showing of disparity and the defendant's rebuttal explanation of the disparity, the essential elements of a disparate impact case will have been placed before the trier of fact.

Similarly, the business necessity defense to disparate impact claims and the legitimate nondiscriminatory reason defense to disparate treatment claims are not "so distinct and separable" from one another that they may be considered separately by multiple factfinders without violating the Seventh Amendment. *Gasoline Prods. Co. v. Champlin Refining Co.,* 283 U.S. 494 (1931). To rebut the plaintiffs' claim that any one of the challenged employment practices resulted in a disparate im-

pact, the defendants must establish that the "challenged practice is job-related for the position in question and consistent with business necessity." 42 U.S.C. § 2000e-2(k)(1)(A)(I). A tight weave exists between these theories, making it difficult to conceive of a challenged practice that is job-related and a business necessity, and yet not a legitimate nondiscriminatory reason for an adverse employment action taken pursuant to that practice.[29]

In *Allison*, we upheld the decision not to certify a bifurcated class where the district court would have to decide the disparate impact claim before the disparate treatment claims. The district court aptly noted that to reach any equitable or incidental monetary relief, it would have to hold a class action bench trial before trying any aspects of the pattern or practice claim to the jury, necessarily running afoul of the Seventh Amendment. *Allison,* 151 F.3d at 425 (*citing Roscello,* 726 F.2d at 221). "Nor could [the equitable issues] be advanced in a *subsequent* class action without being barred by res judicata and collateral estoppel." *Id.* (citations omitted).[30]

---

[29] Both of these issues are questions of fact, *see, e.g., St. Mary's Honor Ctr. v. Hicks,* 509 U.S. 502, 524 (1993); *Wards Cove Packing Co. v. Atonio,* 490 U.S. 642, 660 (1989), common to both claims, *see Allison*, 151 F.3d at 424.

[30] *See also Lemon,* 216 F.3d at 582 (noting, in a case of divided certification, that the Seventh Amendment requires a court to adjudicate the damages claims first, "even if adjudication of these claims decides the equitable claims as well"). Plaintiffs make much of language in *Lemon* and *Jefferson v. Ingersoll Int'l Inc.*, 195 F.3d 894 (7th Cir. 1999), regarding the possibility of bifurcating claims under rule 23(b)(2) and (3). They fail to
(continued...)

Here, the district court attempted to avoid this problem by determining that "[t]he Seventh Amendment will not be violated in this case because all claims will be tried to a jury before any final court determination of the equitable claims is made." While possibly avoiding the Seventh Amendment issue, this course of action creates an insurmountable superiority obstacle.

To meet the requirements of the Seventh Amendment, one jury may have to hear all the issues regarding the pattern and practice claim. This same jury would have to determine the quantum of compensatory and punitive damages. *See Hardin,* 227 F.3d at 272. This would require an enormous amount of time, potentially empaneling a single jury for a one-year period. This situation is not one in which the bifurcation plan certified "discrete liability"

issues. To the contrary, it is a fact-intensive inquiry of a medium-sized class.

The district court offered several countervailing considerations when it stated that, in addition to there being the benefit of judicial economy, the plaintiffs would benefit from a *Teamsters* approach, rather than being forced to prove intentional discrimination via *McDonnell Douglas*.[31] The court was convinced that, without certification, there would be unnecessary duplication of effort, increased litigation costs, and consumption of judicial resources.[32] The court also felt that

---

[31] Plaintiffs argue that in their individual cases, they would not be allowed to use proof of a "pattern and practice" of discrimination. They cite authority from other circuits.

The issue, however, appears to be open in this circuit. We do not resolve it but note that the Supreme Court has recognized the critical distinction between pattern or practice claims and individual discrimination claims as well, albeit in a different context:

> The crucial difference between an individual's claim of discrimination and a class action alleging a general pattern or practice of discrimination is manifest. The inquiry regarding an individual's claim is the reason for a particular employment decision, while at the liability stage of a pattern-or-practice trial the focus often will not be on individual hiring decisions, but on a pattern of discriminatory decision-making.

*Cooper,* 467 U.S. at 876 (quotation marks omitted) (holding that a successful individual claim cannot, on its own, support a pattern or practice claim).

[32] Although the court did not use the precise phrase "judicial crisis," even if it were worried
(continued...)

---

[30](...continued)
take note of three obstacles to those cases' application here.

First, in *Jefferson* the court assumed that the requirements of rule 23 were otherwise met. Second, *Jefferson* was only a pattern and practice suit, with no disparate impact claims. The suit also was concerned with whether a claim could be tried under rule 23(b)(2) where compensatory and punitive damages were available. The court agreed (but perhaps with less intensity) with the *Allison* court that the 1991 changes to the statute tilted the balance away from rule 23(b)(2), because to be certified under that provision, monetary damages would have to be incidental. *Jefferson*, 195 F.3d at 898-99. Third, after acknowledging that the Seventh Circuit had adopted *Allison*'s reasoning regarding whether the requested monetary damages (compensatory and punitive) were incidental to the requested injunctive relief, the *Lemon* court remanded for the district court to consider whether the class could be certified under rule 23(b)(3).

16

timid, though wronged, plaintiffs who might not sue alone would have their claims brought should their be a class option. The court twice remarks that subclasses may be employed to resolve manageability problems. Such a remark seems to underestimate the logistical demands created by the right to jury trial coupled with the individual inquiries. To repair the Seventh Amendment problem, the court created a superiority problem.[33]

A second superiority obstacle flows from our predominance inquiry. The predominance of individual-specific issues relating to the plaintiffs' claims for compensatory and punitive damages in turn detracts from the superiority of the class action device in resolving these claims.[34] These manageability problems are exacerbated by the facts of this case.[35]

---

[32](...continued)
about a crisis the court may not make a superiority determination based on the speculation that 200 independent cases will be pursued. *Castano*, 84 F.3d 734 (5th Cir. 1996).

[33] This issue may not necessarily arise in all title VII cases, but it will likely occur where, as here, plaintiffs allege multiple theories, either party demands a jury trial, and plaintiffs seek both compensatory and punitive damages.

[34] *See Allison,* 151 F.3d at 420 (explaining that the greater the number of individual issues there are, the less likely superiority can be established).

[35] For instance, Texaco claims that the job-posting policy actually changed during the class period. This means that groups of plaintiffs potentially will have suffered harm from different policies, reducing the commonality element for the liability issues related to the job-posting policy claim.

Finally, the "most compelling rationale for finding superiority in a class actionSSthe existence of a negative value suitSSis missing in this case. *See Castano,* 84 F.3d at 748. The relatively substantial value of these claims and the availability of attorneys' fees eliminate financial barriers that might deter individuals from pursuing claims. *See id.* Although a negative value suit is not a prerequisite to class certification, its absence is a significant detraction from the superiority of the class action device. Based on these several limitations, the district court abused its discretion when it found the class action format to be superior.

*En toto*, the plaintiffs attempt to avoid decertification by arguing that the common, umbrella issue regarding the existence of plant-wide, racially-discriminatory practices or policies at the Star locations justifies rule 23(b)(3) class certification. This argument, however, fails to appreciate the overwhelming number of individual-specific issues, as to both the theories of recovery and the damages sought. Moreover, it fails to provide a basis from which to distinguish *Allison*. The district court applied an incorrect legal standard in granting rule 23(b)(3) certification.

### G.

Defendants claim that *Castano* requires that the district court detail a litigation plan. This is an overstatement. In *Castano*, we criticized the district court for certifying a class in the absence of any knowledge of how an addiction-as-injury case actually would be tried. *Castano*, 84 F.3d at 745. *Castano* did not establish a general rule; rather, it disallowed certification where the district court had confronted a claim involving an enormously complicated (and immature) mass tort with no track record of trials from which the district

17

court could draw the information necessary to make the predominance and superiority analysis required by rule 23. *See id.* at 747. *Castano* merely requires district courts to appreciate the legal theories applicable in a particular case, not to recite standard management strategies for common suits.

This case is both different from and similar to *Castano.* Its difference lies in the fact that employment discrimination cases are not new-fangled. Its similarity lies in the fact that the district court *might* have been able to describe a management plan that would resolve the superiority challenges presented in this case. It did not do so, however. This omission is a lost opportunity, not a defect.

### H.

Rule 23(f) states:

A court of appeals may in its discretion permit an appeal from an order of a district court granting or denying class action certification under this rule if application is made to it within ten days after entry of the order. An appeal does not stay proceedings in the district court unless the district judge or the court of appeals so orders.

The plaintiffs argue that Texaco's challenge to the district court's equitable tolling of the statute of limitations is an impermissible interlocutory appeal.

Rule 23(f) is narrowly drafted and is not intended to serve as an end-run around the final judgment rule. "[U]nder Rule 23(f), a party may appeal only the issue of class certification; no other issues may be raised." *Bertulli v. Indep. Ass'n of Cont'l Pilots*, 242 F.3d 290 (5th Cir. 2001). "[A]n order is final

only when it 'ends the litigation on the merits and leaves nothing for the court to do but execute the judgment.'" *United States v. Garner,* 749 F.2d 281, 285 (5th Cir. 1985) (quoting *Firestone Tire & Rubber Co. v. Risjord,* 449 U.S. 368, 373 (1981)). "The purpose behind [the final judgment rule] is to avoid piecemeal appeals, which in turn conserves 'judicial energy' and may help eliminate delay." *Sherri A.D. v. Kirby,* 975 F.2d 193, 201 (5th Cir. 1992) (citation omitted).

One of the exceptions to the final judgment rule is the collateral order doctrine, announced in *Cohen v. Beneficial Indus. Loan Corp.,* 337 U.S. 541 (1949). "The collateral order doctrine establishes that certain decisions of the district court are final in effect although they do not dispose of the litigation." *Davis v. E. Baton Rouge Parish Sch. Bd.,* 78 F.3d 920, 925 (5th Cir. 1996). Under this doctrine, some orders may be appealed despite the absence of final judgment if they (1) are conclusive, (2) resolve important questions that are separate from the merits, and (3) are effectively unreviewable on appeal from the final judgment in the underlying action.[36] This rule does not properly apply to the circumstances of this case.

Without turning to the merits of the court's equitable tolling decision, we note that if this issue comes up for review in a subsequent appeal, it is the plaintiffs' burden to demonstrate

---

[36] *See In re Grand Jury Subpoena,* 190 F.3d 375, 381 (5th Cir. 1999) (quoting *Cunningham v. Hamilton County,* 527 U.S. 198 (1999)), *cert. denied*, 529 U.S. 1062 (2000).

18

that equitable tolling was appropriate.[37] Additionally, equitable tolling applies only in "rare and exceptional circumstances." *Davis v. Johnson,* 158 F.3d 806, 811 (5th Cir. 1998). Neither a plaintiff's unfamiliarity with the legal process nor his lack of representation during the applicable filing period merits equitable tolling. *Barrow v. New Orleans S.S. Ass'n,* 932 F.2d 473, 478 (5th Cir. 1991).

The district court's reference to FED. R. CIV. P. 15(c)(3) is somewhat perplexing.[38]

---

[37] *See Hood v. Sears, Roebuck & Co.,* 168 F.3d 231, 232 (5th Cir. 1999) (stating that claimant bears the burden in title VII cases).

[38] Rule 15(c) states:

(c) Relation Back of Amendments. An amendment of a pleading relates back to the date of the original pleading when

. . .

(2) the claim or defense asserted in the amended pleading arose out of the conduct, transaction, or occurrence set forth or attempted to be set forth in the original pleading, or

(3) the amendment changes the party or the naming of the party against whom a claim is asserted if the foregoing provision (2) is satisfied and, within the period provided by Rule 4(m) for service of the summons and complaint, the party to be brought in by amendment (A) has received such notice of the institution of the action that the party will not be prejudiced in maintaining a defense on the merits, and (B) knew or should have known that, but for a mistake concerning the identity of the proper party, the action would have been brought against

(continued...)

Star employees were told by counsel in the *Roberts* action that they were included; at least one brief in the *Roberts* case contended that Star employees were part of the *Roberts* class. Star, however, never was made a defendant.

Nevertheless, the district court determined that the current action against Star can be treated, for limitations purposes, as if it is "adding" a previously-notified defendant to the "original pleading" in *Roberts*. Otherwise, the pleading in this case serves as the "original pleading" and cannot relate back to anything that is time-barred. It appears, then, that the district court allowed misled non-plaintiffs to file and relate back a new cause of action to a non-defendant of a previous (and at some level, separate) action.

I.

Several of the defendants claim that the class should not have been certified as to them because they had neither an "employment relationship" nor an employment contract with the plaintiffs. In light of our decision that the class is to be decertified, it is sufficient for this appeal that at least one appellant was properly before this court.

REVERSED and REMANDED.

<span style="color:red">ENDRECORD</span>

---

[38](...continued)
the party.

19

REAVLEY, Circuit Judge, dissenting:

My esteemed colleagues reverse the class action certification because, they say, the district court applied an incorrect legal standard in granting the Rule 23(b)(3) certification. I can find no legal error in that court's excellent memorandum opinion published at 88 F. Supp.2d 663, and produced after full briefing and a three-day hearing, and following more than three years of pretrial activity. I would affirm.

The fault is said to be the lack of predominance of the class-wide discriminatory pattern claim over individual damage claims and the lack of superiority or efficiency of a class action proceeding over individual trials. The district court explained, at pages 680-83, why the claim of the 200 salaried black employees, a homogenous group who suffered similar damages from an employer's alleged policy of intentional discrimination, predominated. And the court then explained why the class action would be far superior to individual trials in fair and efficient adjudication, the latter path tying up the court for at least 200 weeks. One wonders where these two circuit judges have acquired the expertise to fault this experienced trial judge on the management of his trials. They concede that this decision is one for his discretion.

Actually, though purporting to recognize "the essentially factual basis of the certification inquiry," the majority pays little attention to the factual particulars of the case and does not address any erroneous finding in concluding that an abuse of discretion has been committed. This opinion does much more than override a district court's judgment in a specific case. It does indeed address an error of law, and that error is seen as the granting of certification of

a class where its members seek individual damages. The Fifth Circuit rule of law, if this opinion stands, is that there can be no class action where the class members seek individual personal damages beyond those incidental to a claim for equitable relief. The very same considerations and rule would apply whatever the nature of the common claim. In this respect, Rule 23 applies to Title VII as amended in 1991 as it does to any other claim. That changes Rule 23(b)(3) and departs from precedent as well as the advisory committee's note which states that "(b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results."[39]

Twenty-four years ago the Supreme Court prescribed a different rule and model for the class action where the class claims a pattern or practice of discrimination. International Brotherhood of Teamsters v. United States.[40] The trial proceeds in two or more stages. At the first stage, the plaintiffs' "burden is to demonstrate that unlawful discrimination has been a regular procedure or policy followed by an employer or group of employers."[41] If the plaintiffs seek individual relief as victims of that practice, the case moves to the next stage to determine the consequences to the individual, where the class members are entitled to a

---

[39] FED. R. CIV. P. 23 advisory committee's note (1966 Amendment).

[40] 431 U.S. 324 (1977).

[41] Id. at 360.

presumption that the employer had discriminated against them.[42]

I.

It may be that this decision, along with <u>Allison v. Citgo Petroleum Corp.</u>,[43] will, at this time, be treated only as a Title VII exception to Rule 23. These opinions point to the 1991 amendment as radically changing, or forbidding, class actions in Title VII cases. That is an inexplicable position, because the amendment did nothing more than allow legal damages for claimants; and that factor had been no bar to class actions in employment cases brought under 42 U.S.C. § 1981. But if this is Fifth Circuit law, only Title VII class actions for equitable relief (including back pay) remain. However, if employees are barred from a Rule 23(b)(3) class action to obtain legal damages, what is the consequence of and to a class action under Rule 23(b)(2)? Would members of the class encounter an objection of splitting their damages (between back pay and consequential damages) in their individual actions?[44] If so, they may

---

[42] <u>See</u> <u>id.</u> at 362; <u>see also</u> <u>Lee v. Washington County Bd. of Educ.</u>, 625 F.2d 1235, 1239 (5th Cir. 1980) ("Once purposeful discrimination against a class is proved, a presumption of an entitlement to back pay and individual injunctive relief arises with respect to members of that class."); <u>Davis v. Board of Sch. Comm'rs</u>, 600 F.2d 470, 474 (5th Cir. 1979) <u>on rehearing</u>, 616 F.2d 893 (1980); <u>Turner v. Texas Instruments, Inc.</u>, 555 F.2d 1251, 1255 n.1 (5th Cir. 1977).

[43] 151 F.3d 402 (5th Cir. 1998).

[44] As a general proposition, of course, if the elements of res judicata are met, the doctrine bars all claims that were or could have been brought in an earlier action. <u>See</u> <u>United States v. Shanbaum</u>, 10 F.3d 305, 310 (5th Cir. 1994) (recognizing that "claim preclusion prohibits either party from raising any claim or defense in the later action that was or could have been raised in support of or opposition to the cause of action asserted in the prior action"). This general principle extends to class actions. <u>See</u> <u>Penson v. Terminal Transport Co.</u>, 634 F.2d 989, 994, 996 (5th Cir. 1981) (noting "the advent of the 'hybrid' Rule 23(b)(2) class action in which individual monetary relief for class members, typically back pay, is sought in addition to classwide injunctive or declaratory relief," and recognizing that "[a] judgment or consent decree entered in a class action can bind the absent class member even though the member had filed a claim or instituted a personal suit before the decision in the class action"). However, Rule 23(c)(4) provides that class actions may be limited to particular
(continued...)

22

or may not choose to remain in the (b)(2) class. The notice provision of Rule 23(c)(2) does not apply to a (b)(2) action, but surely these employees need to be informed of the problem. Even if there is no problem for the member of a (b)(2) class obtaining equitable relief and then pursuing legal damages in an individual action, should the employees not be informed of the fact and limits of relief in the class action? This situation raises questions of numerousness and commonality under Rule 23(a). If, after notice to the class members, simultaneous individual suits for legal damages were allowed, perhaps the class action could proceed. That legal rigmarole might please my colleagues but certainly not the trial court and those plaintiffs forced to endure the expense and delay of individual trials.

Moreover, Congress did not intend to foreclose the benefits of class action treatment to injured parties by the Civil Rights Act of 1991. The purposes of the Act were "first, to provide monetary remedies for victims of intentional employment discrimination to compensate them for resulting injuries and to provide more effective deterrence; and second, to respond to the Supreme Court's recent decisions by restoring federal civil rights protections

---

[44](...continued)
issues, and courts might recognize that individual suits for compensatory damages should not be barred by a judgment in a related class action, if the court hearing the class action concluded that compensatory damages were not amenable to resolution in a class action, and chose to hear only claims for equitable relief. Cf. D-1 Enters., Inc. v. Commercial State Bank, 864 F.2d 36, 38 (5th Cir. 1989) ("Essential to the application of the doctrine of res judicata is the principle that the previously unlitigated claims to be precluded could and should have been brought in the earlier litigation."); Bogard v. Cook, 586 F.2d 399, 408-09 (5th Cir. 1978) (holding that class action seeking equitable relief did not bar subsequent individual suit for damages where class action notice did not alert class members to possibility that they could seek individual damages and inclusion of individual damage claims would have made class action unmanageable).

against employment discrimination."[45]

Note that the expansion of remedies in the Civil Rights Act of 1991 to include compensatory and punitive damages only applies to employers with more than fourteen employees.[46] The Act targets larger employers, yet our court interprets it to protect large employers from the formidable plaintiffs' tool of Rule 23. If one doubts that the class action is an important tool to plaintiffs seeking redress for employment discrimination, witness the recent Coca-Cola settlement of an employee class action alleging race discrimination.[47] Earlier settlements of an employee class action suit against Texaco, which the present suit followed, and one against Mitsubishi, further attest to the value of the class action to plaintiffs in employment discrimination suits.[48] Because Congress chose to increase the remedies available to Title VII plaintiffs, our court would put an end to the substantial settlements available to Title VII plaintiffs though the class action device.

The result the majority reaches is all the more anomalous given the origins of the current Rule 23. The rule was rewritten in 1966, and subpart (b)(2) "was added . . . primarily to

---

[45] H.R. Rep. No. 102-40(I), at 14 (1991), reprinted in 1991 U.S.C.C.A.N. 549, 552.

[46] 42 U.S.C. § 1981a(b)(3).

[47] See Betsy McKay, *Coca-Cola Agrees to Settle Bias Suit for $192.5 Million*, WALL ST. J., November 17, 2000, at A3.

[48] See Darryl Van Duch, *Following Trend, Coke Brings in Bias Monitors*, NEW YORK L. J., June 14, 2001, at 5 (discussing $176.1 million Texaco settlement, $34 million Mitsubishi settlement, and $192.5 million Coca-Cola settlement).

facilitate the bringing of class actions in the civil rights area."[49]  Again, if Rule 23 in its current form was written to accommodate civil rights suits, and if the Civil Rights Act of 1991 was enacted to provide additional remedies for victims of discrimination by larger employers, the very employers that a class action would target, I find it strange indeed that our court would interpret the Act to divest such victims of the class action remedy.

Today's decision and Allison cannot be reconciled with Mullen v. Treasure Chest Casino, LLC.[50]  In Mullen, we affirmed a district court order certifying, under Rule 23(b)(3), a class consisting of 100 to 150 crew members aboard a casino ship who allegedly suffered respiratory illnesses caused by a defective ventilation system aboard the ship.  Even though we recognized that individualized proof of causation, damages, and contributory negligence would be necessary for each class member, we held that the predominance requirement of 23(b)(3) was met, since the common issues of seaman status, vessel status, negligence, and seaworthiness met the predominance requirement of Rule 23(b)(3).[51]  We approved a class certification order where the district court planned to try common issues in a class trial, and individual issues of causation, damages and comparative negligence in a second phase of trials.[52]

Other circuits have agreed with the district court in the pending case that equitable claims

---

[49] 7A CHARLES ALAN WRIGHT ET AL., FEDERAL PRACTICE AND PROCEDURE § 1775 (2d ed. 1986).

[50] 186 F.3d 620 (5th Cir. 1999), cert. denied, 528 U.S. 1159 (2000)

[51] Id. at 626-27.

[52] Id. at 623.

can be certified under Rule 23(b)(2) and legal claims for compensatory and punitive damages can be certified under Rule 23(b)(3).[53]  In my view, the district court committed no legal errors in reaching its decision.

## II.

The matter of punitive damages presents a particular respect in which the majority here, as well as the majority in <u>Allison</u>, fail to follow controlling circuit precedent.  In <u>Jenkins v. Raymark Industries., Inc.</u>,[54] this court held that punitive damages is a common question for class action resolution.  Under the <u>Jenkins</u> bifurcated trial plan, common issues were to be tried by a class jury, and individual issues of causation, actual damages, and comparative fault were to be in later trials.[55]  <u>Jenkins</u> has not been overruled by any en banc decision of this court or any subsequent Supreme Court decision.  The Supreme Court has explained that the "imposition of punitive damages is an expression of . . . moral condemnation."[56]  That decision is better made by addressing the harm, not necessarily the precise dollar count, done to the class.

The majority describes <u>Jenkins</u> as "binding circuit precedent," but regards it as not

---

[53] <u>See</u> <u>Jefferson v. Ingersoll Int'l, Inc.</u>, 195 F.3d 894, 898 (7th Cir. 1999); <u>Eubanks v. Billington</u>, 110 F.3d 87, 96 (D.C. Cir. 1997).

[54] 782 F.2d 468 (5th Cir. 1986).

[55] <u>Id.</u> at 471.

[56] <u>Cooper Indus. v. Leatherman Tool Group, Inc.</u>, 121 S. Ct. 1678, 1683 (2001).

controlling because of "language" in <u>Kolstad v. American Dental Ass'n</u>,[57] and "the statutory requirement that the defendants' intent be directed against an aggrieved individual." Again, I am at a loss to find anything about Title VII and the amendments of 1991 that make Title VII particularly ill-suited to class action treatment. The "statutory requirement" on which the majority relies appears to be 42 U.S.C. § 1981a(b)(1), which provides that punitive damages may be recovered if the defendant engaged in discriminatory conduct "with malice or with reckless indifference to the federally protected rights of an aggrieved individual." This provision simply sets out the mens rea requirement for the recovery of punitive damages. To read this language to prohibit a single, class-wide award of punitive damages is wholly unwarranted under the wording of the statute itself and, as discussed above, a bizarre consequence for a statute intended to expand the remedies and protections available to employees under the civil rights laws.

As for <u>Kolstad</u>, the Supreme Court did not there say anything to reject the notion that a single punitive damage award can, in appropriate cases, be made by a jury sitting in a class action dispute. <u>Kolstad</u> did not address this question. <u>Kolstad</u> holds that an employer can be assessed punitive damages for the acts of a managerial agent acting in the scope of his employment, but not where the discriminatory employment decisions of managerial agents "are contrary to the employer's good-faith efforts to comply with Title VII."[58] When faced with evidence of discriminatory acts of its managerial agents, an employer's defense that it

---

[57] 527 U.S. 526 (1999).

[58] <u>Kolstad</u>, 527 U.S. at 545 (internal quotation marks omitted).

engaged in a good-faith effort to comply with Title VII is particularly well-suited to class or subclass determination. The Court describes this defense as "whether the [defendant] had been making good faith efforts to enforce an antidiscrimination policy."[59] Whether an employer has made a good faith effort to enforce an antidiscrimination "policy," almost by definition, is a question common to all class members' cases where class action requirements are otherwise present, and only heightens the commonality of the claims of class members.

As discussed above, this court has recognized that personal injury cases are sometimes suitable for class action treatment. The availability of compensatory and punitive damages to Title VII plaintiffs, by virtue of the Civil Rights Act of 1991, make Title VII cases all the more similar to personal injury cases, and I fail to see any meaningful basis for the court to create a "Title VII exception" to Rule 23. If anything, the congressional purpose of expanding the protections and remedies available to Title VII plaintiffs which motivated the passage of the Civil Rights Act of 1991 weighs against the recognition of such an exception. And the common issues of federal law presented in Title VII cases make Title VII a strange body of law to exempt from the class action device. Unlike mass tort cases whose class members may come from different states, Title VII cases are not plagued by the complexities of applying the laws of different states to different class members, a central failing of the class

---

[59] Id. at 546.

certification in the tobacco class action we decertified.[60]

I would follow precedent, adhere to the abuse of discretion standard, and affirm.

---

[60] <u>Castano v. American Tobacco Co.</u>, 84 F.3d 734, 741-44, 747 (5th Cir. 1996).