NIEMEYER, Circuit Judge,
concurring in part and dissenting in part:
I concur in that part of the judgment holding that the district court abused its discretion in certifying individual “subclasses” against the Agent defendants. I dissent from the remainder. I would hold that the district court abused its discretion in certifying a single class for claims against TPCM because the representative parties have not satisfied the requirements of Federal Rules of Civil Procedure 23(a)(3), 23(a)(4), and 23(b)(3).
The majority opinion in this case is able to approve a partial class-action certification only by faibng to account for the full range of the plaintiffs’ claims and the extent to which most of their claims must concededly be adjudicated on an individual basis, ignoring the erosive effect that the individual adjudications of these additional claims has on the predominance requirement of Rule 23(b)(3) that common issues predominate over the individualized questions raised in the action taken as a whole. For example, the majority never addresses the practical and legal difficulties that will arise from the certification of a class action against TPCM with respect to only one or two issues while leaving for individual adjudication in 1,400 separate individual trials the issues of damages and, in some cases, causation, as web as:
1) all claims under the South Carolina Unfair Trade Practices Act;
2) all claims alleging civil conspiracy;
*447 3) all claims involving violations of RICO;
4) all issues that qualify each plaintiff for a claim under the applicable Plan; and
5) all claims against the agents who sold the Plan.
The need for these individualized separate trials is conceded.
Despite the overwhelming predominance of these individualized issues and claims over the common issue that the majority now certifies for class treatment, the majority has adopted an inventive approach to Rule 23 that allows certification of a class where the predominance requirement of Rule 23(b)(3) is admittedly unmet in the context of the case as a whole. According to the majority, to require the certified issue in this case to predominate over the individualized issues in the action as a whole ignores Rule 23(c)(4)(A), which it appears to view as a fourth avenue for class certification, on equal footing with Rules 23(b)(1), 23(b)(2), and 23(b)(3). In doing so, the majority glorifies Rule 23(c)(4)(A) — a housekeeping rule that authorizes a court to certify for class treatment “particular issues” in a case that otherwise satisfies Rule 23(a) and 23(b)— with the effect of materially rewriting Rule 23 such that Rule 23(b)(3)’s requirements no longer need be applied to “[a]n action,” see Fed.R.Civ.P. 23(b), but rather to any single issue, no matter how small.
Not only does the majority’s approach expand Rule 23 beyond its intended reach, but it also creates a direct conflict with the Fifth Circuit which has held:
A district court cannot manufacture predominance through the nimble use of subdivision (c)(4). The proper interpretation of the interaction between subdivisions (b)(3) and (c)(4) is that a cause of action, as a whole, must satisfy the predominance requirement of (b)(3) in that (c)(4) is a housekeeping rule that allows courts to sever the common issues for a class trial.
Castano v. American Tobacco Co., 84 F.3d 734, 745 n. 21 (5th Cir.1996); see also Allison v. Citgo Petroleum Corp., 151 F.3d 402, 421-22 (5th Cir.1998).
In addition, the majority opinion attempts to shoehorn this case, even with its limited focus on a single issue, into the parameters of our distinguishable holding in Central Wesleyan College v. W.R. Grace & Co., 6 F.3d 177 (4th Cir.1993), in which we affirmed the conditional certification of a class of asbestos litigants. In doing this, the majority fails to consider the broad complexities raised by the unaddressed issues in this litigation and fails to apply the later and more specifically applicable controlling ruling of the Supreme Court in Amchem Products, Inc. v. Windsor, 521 U.S. 591, 117 S.Ct. 2231, 138 L.Ed.2d 689 (1997).
Finally, the majority fails meaningfully to address overt conflicts of interest existing among members of the conditionally certified class. For example, it does not attempt to explain how the conditionally certified class may include, on the one hand, employers seeking rescission of the insurance contract and the return of premiums paid, and, on the other hand, their employees seeking enforcement of the same insurance contract to obtain benefits under it. The majority also discounts, on scant deposition testimony, the potentiality that aggrieved employee-class members who were damaged by nonpayment or delayed payment of claims may implead as defendants their employers, who are also class members and who made the decision to purchase the woefully inadequate plan. Even aside from the antagonistic posture of the employer and employee class members, the injured employees’ claims themselves will have to be aggregated into an *448 tagonistic subclasses, based on when their claims were mismanaged and by whom, with entitlement to relief premised on different theories. By lumping all of these employees into one class and apparently casting aside as informally “disavowed” a group of employees’ best theory of recovery, the majority deindividualizes inherently individual claims and lops off substantial limbs from the various class members’ claims in order to bless the conglomeration of a similar, albeit now disabled, class of litigants.
Had these problems been addressed by the majority opinion and the distinguishable aspects of Central Wesleyan, as well as the controlling analysis of Amchem, been explored, it would have become apparent that plaintiffs cannot satisfy, under any applicable precedent, the requirements of Federal Rule of Civil Procedure 28(1) that their claims be typical of the claims of the class so that they can act as representative parties, able fairly and adequately to protect the interests of the class, as required by Rule 23(a)(3) and (4); (2) that common questions of law and fact predominate over questions affecting only individual class members, as required by Rule 23(b)(3); and (3) that the class action be superior to other available methods for the fair and efficient adjudication of the numerous claims and controversies, as required by 23(b)(3).
As a result of the majority’s limited focus on the facts related to a single issue in this case, it has left a difficult and complex procedural structure created by the need to try numerous individual claims for each class member that will result in an unnecessary, and ultimately unhelpful, procedural nightmare. And on a broad judgment level, one has to question the utility of enduring this procedural morass for the purpose of answering the single question certified for class treatment: whether TPCM’s mismanagement was a cause of the Plan’s failure. Answering this question resolves no class member’s claim and only invites the difficult questions of how to proceed once the question is answered. Little, if any, time or effort can be saved by answering this question in the abstract because full individual trials on liability will still have to be conducted for each individual class member.
I would reverse the certification of the class against TPCM in this case for the reasons that follow.
I
Because the majority holds that the district court’s conditional certification of a single issue against TPCM constituted a proper application of Rule 23(c)(4), ante at 425-427, it is necessary to address at the outset the fundamental issue of why the predominance requirement of Rule 23(b)(3) cannot be bypassed by reliance on Rule 23(c)(4). In short, I believe that the majority, in adopting an expansive interpretation of Rule 23(c)(4), has enlarged the reach of Rule 23 in a manner not contemplated by the Rule’s drafters and not consistent with the Supreme Court’s approach calling for an “undiluted” application of Rule 23(b)(3)’s requirements in every case. Amchem, 521 U.S. at 620, 117 S.Ct. 2231; see id. (noting that the Rule, as written, “sets the requirements [courts] are bound to enforce” and counseling against “judicial inventiveness” in application of the Rule). Thus, I would conclude that the history of the Rule and its text, read in light of the Supreme Court’s holding in Amchem, require that even in cases involving the certification of issue-only classes, the common issues must predominate over questions affecting only individual members of the class in the context of the action as a whole. The majority's conclusion to the contrary seems to invite an unhesitating *449 approach to granting class certification where other procedural devices would suffice, and in doing so, it opens a conflict with the Fifth Circuit. Thus, only after I elaborate the basis of my conclusion that a predominance analysis is mandated in every Rule 23(b)(3) class action do I then proceed with the required analysis by looking at the various issues and claims presented in this case.
Of the Rule 23 amendments adopted in 1966, the addition of Rule 23(b)(3) was “the most adventuresome innovation.” Amchem, 521 U.S. at 614, 117 S.Ct. 2231 (internal quotation marks and citation omitted). Because Rule 23(b)(3) was an innovative device and indeed involved some speculation about its impact, the Rule was careful to impose two specific and important requirements that must be found as conditions to certification of any class under the Rule. The “predominance” requirement requires the district court to evaluate the “action” to determine whether “questions of law or fact common to the members of the class predominate over any questions affecting only individual members,” and the “superiority” requirement requires the court to analyze whether the proposed class action would be “superior to other available methods for the fair and efficient adjudication of the controversy” raised by the “action.” Fed. R.Civ.P. 23(b)(3). If an action does not satisfy those two “class-qualifying criteria” in addition to the requirements of Rule 23(a), Amchem, 521 U.S. at 621, 117 S.Ct. 2231, there is no basis for the court to certify a proposed class, even on a conditional basis. The predominance and superiority requirements are thus organic to every 23(b)(3) action. In Amchem, where the plaintiffs sought to bypass the predominance requirement in certifying a class for settlement, the Supreme Court could not have made that proposition any clearer:
In addition to satisfying Rule 23(a)’s prerequisites, parties seeking class certification must show that the action is maintainable under Rule 23(b)(1), (2), or (3).
To qualify for certification under Rule 23(b)(3), a class must meet two requirements beyond the Rule 23(a) prerequisites: Common questions must “predominate over any questions affecting only individual members”; and class resolution must be “superior to other available methods for the fair and efficient adjudication of the controversy.”
Id. at 614-15, 117 S.Ct. 2231. Indeed, the Court emphasized that Rule 23(b)(3)’s requirements are “class-qualifying criteria” and that “[f]ederal courts ... lack authority to substitute for Rule 23’s certification criteria” any other standard than the one adopted in the rule itself. Id. at 621-22, 117 S.Ct. 2231.
Even though every class action must pass through the gates of Rule 23(b)(3), a court is, of course, entitled to take into account the manageability tools supplied by Rule 23(c)(4) in determining whether the predominance and superiority requirements of Rule 23(b)(3) are satisfied with regard to the action as a whole. Thus, just as a court may consider the availability of subclasses in determining whether an action satisfies Rules 23(a) and 23(b)(3), see Ortiz v. Fibreboard Corp., 527 U.S. 815, 856, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999)(noting that, at the class certification stage, the availability of subclasses to eliminate conflicting interests could factor into whether the requirement of Rule 23(a)(4) is satisfied), so may it consider the availability of issue-only classes in making the same determinations. In either case, for such subclasses or issue-only classes to be *450 useful management tools in a particular case, they, too, must individually satisfy the requirements of Rule 23(a) and 23(b)(3). See Fed.R.Civ.P. 23(c)(4) (providing that, if a court utilizes issue-only classes or subclasses, “the provisions of this rule shall then be construed and applied accordingly”). In the case before us, however, the threshold dispute I have with the majority is not whether the single-issue class that has been certified here satisfies Rule 23(b)(3),[1] but rather whether an issue-only class action may be maintained under Rule 23(c)(4) when the common issue does not predominate over the other issues in the litigation that affect only individual members.
I conclude that when the text of Rule 23(b)(3) provides that “questions of law or fact common to the members of the class [must] predominate over any questions affecting only individual members” in “[a]n action,” “action” means the action as a whole. And I do not believe that the possibility of bringing or maintaining an action “with respect to particular issues” was ever meant to expand Rule 23(b)(3) to allow class certification when the individual issues in the class members’ case against a defendant tower over the comparably insignificant common issue or issues. The majority disagrees with my reading, which it disparages as “rigidly sequential,” ante at 449, instead adhering to a reading of Rule 23(c)(4) that allows a district court to certify any common issue in the litigation, no matter how small. In my view, the majority’s interpretation of Rule 23(c)(4) invites a diluted application of Rule 23(b)(3) in the context of issue-only classes, which I respectfully submit departs from the principle elaborated in Amchem.
The core question addressed by the Supreme Court in Amchem was the interplay between Rule 23(b)(3) and 23(e), the provisions upon which the parties sought certification of a settlement-only class and, ultimately, approval of the negotiated settlement. The settling parties viewed the predominance requirement as a requirement applicable only to an action that was destined for trial, and therefore they argued that cohesion of the action and fairness for settlement was better determined by a hearing under Rule 23(e) when approving settlement. Because the Supreme Court in Amchem analyzed the relationship between the predominance requirement of Rule 23(b)(3) and the settlement authority of Rule 23(e), its analysis is apposite to the analysis of whether the predominance requirement of Rule 23(b)(3) can be subverted by Rule 23(c)(4)(A).
The district court in Amchem certified the settlement-only class over objectors’ strenuous objections that the Rule 23(b)(3) class did not meet the requirements of Rule 23(a) and (b)(3). The Third Circuit vacated the class certification, holding that the settlement-only class satisfied neither Rule 23(a) nor 23(b)(3) and that the cases should proceed either through consolidation under Rule 42(a) or as smaller class actions under Rule 23. 521 U.S. at 611, 117 S.Ct. 2231. Affirming the Third Circuit, the Supreme Court “emphasize[d]” that the requirements of Rule 23(a) and (b)(3) are “safeguards,” not “impractical impediments” that can be disregarded by a court that perceives a measure of fairness in overlooking these standards in a particular case. Id. at 621, 117 S.Ct. 2231. While holding that settlement was “relevant” to class certification and acknowledging that the manageability of a trial was not relevant to a class action where no trial was contemplated, the court noted that the other specifications of the Rule, *451 including the predominance requirement, “demand[ed] undiluted, even heightened attention.” Id. at 620, 117 S.Ct. 2231. Requiring a settlement-only class to satisfy Rule 23(b)(3)’s requirements, the Court held, “serve[s] to inhibit appraisals of the chancellor’s foot kind — class certifications dependent upon the court’s gestalt judgment or overarching impression of the settlement’s fairness.” Id. Importantly, the Court concluded that “it is not the mission of Rule 23(e) to assure the class cohesion that legitimizes representation action in the first place.” Id. at 623, 117 S.Ct. 2231. “If a common interest in a fair compromise could satisfy the predominance requirement of Rule 23(b)(3),” the Court continued, “that vital prescription would be stripped of any meaning in the settlement context.” Id.
Just as it is not the mission of Rule 23(e) to supply the cohesion that legitimizes a settlement-only class action, neither is it the mission of Rule 23(c)(4)(A) to supply the cohesion to legitimize an issue-only class action. In both situations, the cohesion essential to legitimize a 23(b)(3) class action can be shown only when the action as a whole satisfies the predominance requirement of Rule 23(b)(3). The principle of Amchem is that every Rule 23(b)(3) class action must satisfy all of the provisions of Rule 23(a) and (b)(3), and the other provisions of the Rule, including Rule 23(e), cannot be used to dilute the requirement that each proposed class must satisfy the predominance requirement to merit certification. In my view, the majority’s reading of Rule 23(c)(4) allows for a diluted application of Rule 23(b)(3) by removing from the predominance calculus most of the individualized issues in the case.
Under the majority’s analysis, which looks at the common issue in the case through a pinhole and ignores all other issues, Rule 23(b)(3)’s vital prescription is stripped of any meaning in an even more dramatic way than it was in Amchem. The majority in this case boldly holds that individualized claims and issues in this action are not a factor in analyzing whether common issues predominate in the certified claim against TPCM, leaving one to wonder exactly what the isolated common issue must predominate over. For if Rule 23(c)(4)(A) allows a court to omit from its predominance analysis any claims or issues affecting only individual members, it would seem that the predominance of the selected issue is a foregone conclusion since the common question of law or fact would always predominate over the individual issues that are not a factor. And in the rare instance where the majority might find a common issue not to predominate in a given case, it could simply narrow the pinhole until, in its view, the selected issue predominates over the other issues it chooses to see. Indeed, nothing in the majority’s opinion supplies any lower limit on just how narrow a common issue may be before its analysis must yield to common sense. By adopting a view of Rule 23(c)(4)(A) that strips Rule 23(b)(3) of its meaning, necessitating the aid of additional principles found nowhere in the Rule itself, the majority has “substitute[d] for Rule 23’s certification criteria a standard never adopted,” a substitution that “[f]ederal courts ... lack authority” to make. Amchem, 521 U.S. at 622, 117 S.Ct. 2231.
In an effort to enlist legal authority to interpret Rule 23 to authorize a class action on a single issue, the majority, in Part V, misconstrues how I have interpreted Rule 23 and fails to appreciate the consequences of reading the Rule in a manner that lets Rule 23(c)(4) serve as a gate house for determining whether a class action should be certified. Even as an action may include different “causes of action” or different theories of recovery, all causes of *452 action or claims must be related to form the action. See Fed.R.Civ.P. 18-21, 42. And Rule 23 provides that, to qualify “an action” as a class action, the prerequisites of both subdivision (a) and subdivision (b) be satisfied. See Fed.R.Civ.P. 23(b). Subdivision (c) then addresses the management of the class action authorizing the certification of either issues or sub-classes. But a class certification with respect to an issue cannot, without bypassing Rule 23(b), be undertaken unless the issue is so important to disposition of “the action” that it “predominates over any questions affecting only individual members.” Rule 23(b)(3). None of the cases cited by the majority advocate such a bypassing that the majority now advances as an entirely novel proposition.
The majority criticizes my demand that a full predominance analysis be conducted, as required by Rule 23 and Amchem, both insisting that it can rely on a single issue to certify the class — notwithstanding a conclusion that the predominance test would not be satisfied in the context of the action as a whole — and stating that I have “ignore[d] the plain language of [Rule 23(c)(4) ],” ante at 438-439, and that my analysis “render[s] a subsection of the rule superfluous,” ante at 439.
I disagree. This very case illustrates the importance of my conceptual disagreement with the majority and the inviability of the majority’s position. In this case, the class members have asserted seven causes of action against TPCM: an unfair trade practices claim, a negligent undertaking claim, a fraud claim, a negligent misrepresentation claim, a breach of contract claim, a civil conspiracy claim, and a RICO claim. The majority, without identifying to which of these seven causes of action the certified issue belongs, has certified for class treatment the vague question whether TPCM was “a cause” of the failure of the Plan. Naming this certified question a “cause of action,” but not tying it to any specific claim in the complaint, the majority makes the analysis of what this common question must predominate over particularly abstruse. The majority’s analysis seemingly identifies a common causation issue and then jumps immediately to Rule 23(c)(4)(A) to insulate the newly certified issue-only class from the scrutiny of the predominance requirement in the context of the case as a whole, even as the plaintiffs urged consideration of the entire action and certification of the action as a whole. See Pls.’ Mot. for Class Certification at 4 (seeking certification of a single class for all seven causes of action against TPCM and certain other defendants).
In failing to examine the various other issues presented in the entire action to determine whether the required “cohesiveness” is present to “legitimize! ] representative action in the first place” — as mandated by 23(b)(3), see Amchem, 521 U.S. at 623, 117 S.Ct. 2231 — and by jumping to 23(c)(4), the majority not only bypasses one of the most essential and most important checks imposed by Rule 23 on certifying Rule 23(b)(3) classes, it also opens a conflict among the circuits on this issue. The Fifth Circuit has applied the Rule with the dogged requirement of satisfying predominance before considering other aspects of the Rule in a 23(b)(3) class. See Smith v. Texaco, Inc., 263 F.3d 394, 409 (5th Cir.2001) (later withdrawn pursuant to settlement by the parties, see 281 F.3d 477 (5th Cir.2002)); Allison, 151 F.3d at 421-22; Castano v. American Tobacco Co., 84 F.3d 734, 745 n. 21 (5th Cir.1996). In Smith, the court explained its position on the proper relationship between the predominance requirement and Rule 23(c)(4):
The predominance inquiry involves a comparison of the issues common among the class members and the issues indi *453 vidual to them. This analysis remains unchanged whether a class is certified under one or more sections of rule 23(b). The inquiry’s constancy serves as an important limitation on the use of bifurcation by preventing a district court from manufacturing predominance through the “nimble use” of Rule 23(c)(4). Castano v. Am. Tobacco Co., 84 F.3d 734, 745 n. 21 (5th Cir.1996). Therefore, the cause of action, as a whole, must satisfy rule 23(b)(3)’s predominance requirement. Id. Once that requirement is met, rule 23(c)(4) is available to sever the common issues for a class trial. To read the rule not as a housekeeping rule, but instead as allowing a court to pare issues repeatedly until predomination is achieved, would obliterate rule 23(b)(3)’s predominance requirement, resulting in automatic certification in every case in which any common issue exists, a result drafters of the rule could not have intended.
263 F.3d at 409; see also Allison, 151 F.3d at 421-22. Cf. Valentino v. Carter-Wallace, Inc., 97 F.3d 1227, 1234 (9th Cir.1996) (reversing a district court’s effort to rely on 23(c)(4) and bypass 23(b)(3) but acknowledging that in “appropriate cases” the predominance requirement could be overlooked). We can identify no precedent from the Supreme Court or from our fellow Circuits to support the majority’s holding.
The majority’s breathtaking assertion that its reading of Rule 23(c)(4) does not in any way contravene the Fifth Circuit’s cases is simply not true. The Fifth Circuit, by its very language, only consults the “housekeeping” provisions of Rule 23(c)(4) “once [the predominance] requirement is met.” Smith, 263 F.3d at 409. This is exactly the “rigidly sequential approach” that the majority criticizes in its opinion, ante at 439, making its claim to consistency with the Fifth Circuit facetious, at best. The majority’s wordsmith-ery with respect to the term “cause of action” does not disguise a plain conflict between the Fifth Circuit’s holding and its holding. To be sure, the majority identifies some district court opinions, commentaries, and a student note that, citing one another, argue in favor of the majority’s interpretation. But I respectfully disagree with the cited authorities, and in doing so, I adhere to the view of the only other circuit court to address the issue.
I would hold therefore that under the proper analysis, the district court must determine that the action as whole satisfies the predominance and superiority requirements imposed by 23(b)(3), and actions satisfying these requirements may be managed through orders authorized by 23(c). Thus, under Rule 23(c)(4), a court could create subclasses or even bifurcate claims by issues, grouping them for class action treatment. But in this complicated case, the predominance and superiority requirements cannot be satisfied even with the aid of the manageability tools supplied by Rule 23(c), as I now proceed to demonstrate in some detail.
II
The plaintiffs in this case are purchasers and beneficiaries of a multi-employer healthcare plan (the “Plan”) sponsored and marketed in South Carolina by the Fidelity Group, Inc. On the Plan’s demise, they commenced this class action under Federal Rule of Civil Procedure 23(b)(3) against the Fidelity Group and related companies and individuals, against 43 agents who marketed and sold the Plan, and against the Plan’s first claims administrator, alleging breach of contract, fraud, mismanagement, and related claims.
The district court, by order dated September 28, 2001, certified 24 parallel *454 classes — one against each of 23 agents and one against the claims administrator — but left for individual trials numerous claims, numerous issues within class-action claims, and all damage issues, concluding that approximately 1,400 mini-trials will be required.
We granted the defendants’ motion to review this order under Federal Rule of Civil Procedure 23(f).
Although discovery has not been completed and the facts have not yet been fully developed, it appears that the Fidelity Group intended to create and market a multi-employer healthcare plan that would be available to small businesses and individuals and that would be subject to regulation by the provisions of ERISA. To do this, it created both the National Association of Business Owners and Professionals (“NABOP”) to act on behalf of potential business customers and the International Workers Guild, Inc., a union to act on behalf of the business customers’ employees and other individuals who might elect coverage under the Plan. NABOP and the International Workers Guild thereafter “negotiated” the Plan to provide healthcare and dental benefits to Plan participants and beneficiaries. The Fidelity Group, through NABOP, then entered into a contract with Third Party Claims Management, Inc. (“TPCM”)[2] to administer the Plan and process claims. Under this contract, effective April 1, 1995, TPCM became responsible for processing incoming claims, determining each claimant’s eligibility for coverage, computing benefits payable, and paying claims out of a bank account maintained by the Fidelity Group and NABOP.
Plaintiffs allege that over the next three years, the Plan’s administration became deficient, causing a backlog in the processing and paying of claims, ultimately contributing to the Plan’s becoming underfunded and to its demise. There is evidence in the record to support allegations that TPCM did a poor job of paying claims, sometimes losing claims and other times adjusting or “adjudicating” claims that should not have been adjudicated. TPCM admits that it did not have a sufficient number of trained claims examiners to stay current with claims being filed, and, as a result, a backlog in claims processing developed that grew to six to eight months. Plan members began to complain widely of the delays in the processing of their claims.
During the same period that TPCM was administering the Plan in this case, it was also experiencing a claims backlog for at least ten other clients. There is evidence that TPCM’s problems were caused in part by the fact that, during the approximately 20 months it was administering claims under the Plan, TPCM moved its claims administration operations twice, each time requiring new notifications to healthcare providers of the need to forward claims to a new address. After TPCM failed to reduce the backlog and fulfill its continuing assurances to the Fidelity Group and NA-BOP that it would correct the deficiencies, NABOP terminated the contract with TPCM for cause, effective May 1, 1997, and the Fidelity Group moved claims administration “in-house,” to be handled by Fidelity Claims Management, Inc.
Because there was a serious backlog and Fidelity Claims Management, lacking both experience and expertise, apparently was not prepared to step in as administrator, Plan members continued to suffer delayed *455 payment or nonpayment of their claims. After more than a year of additional frustration by Plan members, the Secretary of Labor commenced an action in 1998 against the Fidelity Group and related companies and individuals in the Eastern District of New York to take control of the Plan’s assets and to shut down the Plan’s operations. The district court in New York issued a stay, enjoining the prosecution of suits against the Fidelity Group, the Plan, and related corporations and individuals, and it appointed an independent fiduciary to manage the assets. On the fiduciary’s request that the Plan be terminated, the New York district court ordered the Plan terminated, effective January 31, 1999.
The plaintiffs commenced this action on September 11, 1998, and the district court followed the New York court and likewise stayed claims against the Fidelity defendants.[3] But, by an order dated December 27, 1999, the district court lifted the stay as to “all non-Fidelity Defendants,” allowing prosecution of the claims against TPCM for claims mismanagement and against the selling agents for misrepresenting the Plan. The selling agents are 43 individuals and companies that sold the Plan on behalf of the Fidelity Group to businesses and individuals during the period from August 1995, when the Plan commenced, to July 1997, when the agents were ordered by the South Carolina Department of Insurance to cease marketing the Plan.
In their complaint against TPCM and the 43 selling agents, the plaintiffs alleged (1) violations of the South Carolina Unfair Trade Practices Act, S.C.Code Ann. § 39-5-10 et seq.; (2) negligence in undertaking to administer, market, and represent the Plan; (3) fraud in connection with representations made about the formation of the Plan, its benefits, its administration, and its value; (4) negligent misrepresentation, which plaintiffs alleged induced them to purchase and continue to pay for the Plan; (5) breach of contract; (6) civil conspiracy to form, market, and sell a “substantially worthless health care and dental” plan; and (7) violations of RICO, 18 U.S.C. § 1961 et seq. The gravamen of plaintiffs’ claims against TPCM is that TPCM, under circumstances that vary from plaintiff to plaintiff, breached duties to pay plaintiffs’ claims timely and to provide accurate information concerning the status of pending claims. The plaintiffs allege that these breaches not only caused them direct injury but also contributed to the ultimate failure of the Plan, causing them injury on this indirect basis. The gravamen of plaintiffs’ claims against the agents is (1) that the agents sold the plaintiffs worthless insurance that did not comply with South Carolina statutory requirements, (2) that the agents were not licensed to sell the Plan, and (3) that they fraudulently or negligently misrepresented the Plan and provided negligent advice regarding the Plan.
For relief, the employer-plaintiffs that provided the Plan benefits to their employees seek return of the premiums paid for “worthless insurance” as well as consequential damages. The employee-plaintiffs enrolled in the Plan seek payment of the benefits to which they were entitled and consequential damages, including damages for mental anguish, loss of enjoyment of life, injury to their reputations and credit ratings, and costs of rectifying delayed payments. All plaintiffs seek punitive damages.
*456 The plaintiffs sought to represent a class of 1,400 persons, consisting of all persons who purchased coverage under the Plan on or after August 15, 1995, who have claims against TPCM and against the agents as a group, and all employees and beneficiaries who had claims during the three-year period it was operating. They also sought to represent agent-specific subclasses with respect to particular negligence and fraud claims against 23 particular agents. In explanation, they alleged: '
Certain claims against the Defendant Agents, including civil conspiracy and RICO claims, can be treated on a class-wide basis. Other claims against the defendant agents may be more agent-specific and may exist only between those class members and the particular Defendant Agent who marketed, sold, or otherwise provided the coverage under the fund to plaintiffs.
As to the other 20 agents — for whom there were no corresponding named" plaintiffs-— no subclasses were requested.
Troubled somewhat by the problems of granting class treatment as to all asserted claims, the district court granted in part and denied in part plaintiffs’ motion for class certification. In doing so, the court left a complex division between, individualized claims and claims subject to class-action treatment. Assessing the motion for class certification against the requirements of Rule 23, the court first concluded that the number of class members is “approximately 1,400,” which it concluded satisfied the numerosity requirement of Rule 23(a)(1). But on the 23 proposed agent-specific “subclasses,” the court acknowledged that the numerosity issue was a close question. As to one agent, the court noticed that only 8 employees were involved, and 2 of them already had filed individual actions against the agent. Another agent had enrolled only 13 to 14 employees. The court acknowledged that “[wjhile these numbers do not definitely constitute a finding of numerosity, Plaintiffs note that the agent Defendants failed to take into account the significant number of dependents that were also covered by the Plan.” It found that including dependents, there were 11 members of the class for the one agent and 21 for the other. The court did not examine numerosity with respect to the other 21 agent classes but it observed that they contained more members. It concluded, “[w]hile these numbers may fall on the borderline of numer-osity, the court finds that numerosity is met as to these agents.”
The court next concluded that the proposed classes satisfied the commonality and typicality requirements of Rule 23(a)(2) and (a)(3), noting that the common issues included (1) whether TPCM mismanaged plaintiffs’ claims, (2) whether TPCM’s alleged negligence proximately caused the failure of the Plan, and (3) whether the agents misrepresented the Plan to the plaintiffs. The court acknowledged, however, that all claims for “mental anguish or emotional distress” and damage to credit ratings and reputation would have to be decided individually. The court also acknowledged the potential need for individualized mini-trials on proximate causation specifically relating to the reason for nonpayment of a given claim. This was especially true, the court noted, as to “non-adjudicated unpaid claims for medical bills,” i.e., those which had never been analyzed by a claims adjuster.
In evaluating the adequacy-of-representation requirement set forth in Rule 23(a)(4), the court rejected TPCM’s contention that plaintiffs could not represent the class adequately because of conflicts of interest among class members. TPCM had argued that there was a conflict between the employer-plaintiffs who pur *457 chased insurance coverage for their employees and the employee-plaintiffs who might have a claim against their employers and who would in any event be seeking different relief. The court ruled that the employee-plaintiffs’ claims against their employers were not “viable,” and, in any event, the employee' or employer class members “could opt out of the class.”
In considering the requirements of Rule 23(b)(3), the court first concluded that common issues predominated over issues affecting only some of the class members. The court reasoned that, because most of the plaintiffs’ unpaid claims had already been “adjudicated,” individualized inquiries relating to the proximate cause of plaintiffs’ unpaid claims would not be necessary. The court reiterated that causation issues relating to unadjudicated claims could be resolved in the individualized mini-trials necessary also to resolve damages.
As to the 23 agent-specific “subclasses,” the court also acknowledged that oral representations and individual reliance tended to suggest individualized treatment of the claims against the agents. Nonetheless, the court concluded that those defenses could be generalized by presumptions and therefore treated on a class-wide basis:
[A] common sense approach presuming reliance exists may be acceptable in this circumstance. Therefore, in certain cases, “reliance may be presumed for fraud-based common law claims when the alleged omissions and misrepresentations are uniform and material and the class members acted in a manner consistent with reliance.”
Even if the court has erred in its analysis and reliance does threaten the predominance of common issues in this case, that threat can be eliminated by bifur-eating the issues of rebanee where individual inquiries would be proper.
On the superiority requirement of Rule 23(b)(3), the court acknowledged that “[mjanageabibty of this class action is of particular concern to the court,” pointing particularly to the necessity of individual “mini-trials.” However, the court then concluded that
The record presently before the court suggests that bifurcation of individualized damages issues and possibly proximate cause issues regarding non-adjudicated claims would not present an unmanageable scenario for the court.
Addressing separately the civil conspiracy and RICO counts, the court concluded that individualized defenses predominated, and therefore it excluded those claims from class-action treatment. It said:
[T]he court notes a significant problem regarding individualized issues inherent where numerous defendants (in fact a class of defendants) are accused of being part of a vertical conspiracy such as the one alleged in this case. These issues arise primarily due to individualized defenses which may be available to the Agent Defendants.
Therefore, the court concludes that individual issues regarding Plaintiffs’ conspiracy claims predominate rendering class treatment of all Plaintiffs’ conspiracy claims against all Agent Defendants unadvisable.
On the South Carolina Unfair Trade Practices Act count, the court again required individual trials because the statute itself mandates such treatment. See S.C.Code Ann. § 39-5-140(a).
After making this overall division between claims and issues for class-action *458 treatment on the one hand and claims and issues for individual trials on the other, the court entered the following order certifying this case as a class action:
It is, therefore, ordered, for the foregoing reasons that Plaintiffs’ Motion for Class Certification is conditionally granted as modified by this Order. Specifically, the proposed class of all Plaintiffs for claims against TPCM is conditionally certified (excluding claims under the South Carolina Unfair Trade Practices Act). However, class-wide treatment of Plaintiffs’ conspiracy claims against all Agent Defendants is denied. Instead, the court conditionally certifies Plaintiffs’ proposed subclasses currently with representatives based on the Agent Defendants as individual classes for all of the Plaintiffs’ claims (excluding claims under the South Carolina Unfair Trade Practices Act).
In sum, the court certified 24 distinct and parallel class actions, having rejected any overarching class action against the agents, to try a limited range of claims and issues. The court ruled that individual trials would have to be conducted on:
1) all claims under the South Carolina Unfair Trade Practices Act;
2) all claims alleging civil conspiracy;
3) all claims involving violations of RICO;
4) any reliance issues that could not, as a matter of law, be presumed;
5) all damage issues;
6) claims against the 20 agents with whom no named plaintiffs had dealings;
7) all issues regarding the fact and nature of injury specifically as to plaintiffs’ claims of mental anguish and emotional distress, injury to credit rating, and injury to reputation; and
8)all questions relating to whether plaintiffs’ claims were “adjudicated” and to the cause of delayed payment or nonpayment for those not adjudicated.
TPCM and the 23 agent-defendants against whom class actions were certified filed a motion under Federal Rule of Civil Procedure 23(f) for permission to appeal the district court’s interlocutory order, and by order dated November 30, 2001, we granted that motion.
Ill
It is appropriate to set forth the established principles applicable to consideration of the issues. We have previously held that “[district courts have ‘wide discretion in deciding whether or not to certify a proposed class,”’ Central Wesleyan Coll. v. W.R. Grace & Co., 6 F.3d 177, 185 (4th Cir.1993) (quoting In re A.H. Robins Co., 880 F.2d 709, 728-29 (4th Cir.1989)), but we have noted that this discretion must be exercised “ ‘within the framework of Rule 23,’ ” Lienhart v. Dryvit Sys., Inc., 255 F.3d 138, 146 (4th Cir.2001) (quoting In re Am. Med. Sys., Inc., 75 F.3d 1069, 1079 (6th Cir.1996)). Where, as here, the plaintiffs have sought class certification pursuant to Federal Rule of Civil Procedure 23(b)(3), the plaintiffs bear the burden of proving that the “numerosity, commonality, typicality, representativeness, predominance, and superiority requirements of both Rule 23(a) and (b)(3) are met.” Id. The placement of this burden upon the parties seeking class certification reflects the principle that a class action is “an exception to the usual rule that litigation is conducted by and on behalf of the individual named parties only.” Califano v. Yamasaki, 442 U.S. 682, 700-01, 99 S.Ct. 2545, 61 L.Ed.2d 176 (1979). Though the issue of manageability of a proposed class action is “peculiarly within [the] dis- *459 eretion” of the district court, Windham v. Am. Brands, Inc., 565 F.2d 59, 65 (4th Cir.1977), we will nonetheless vacate the certification of a class when plaintiffs have not sufficiently shown the presence of all of the Rule 23(a) and (b)(3) requirements.
Every class action must satisfy the four criteria set forth in Rule 23(a): numerosity, commonality, typicality, and adequacy of representation. Fed.R.Civ.P. 23(a). Numerosity requires that the class be so numerous that “joinder of all members is impracticable.” Fed.R.Civ.P. 23(a)(1). The “final three requirements of Rule 23(a) ‘tend to merge,’ with commonality and typicality ‘serv [ing] as guideposts for determining whether ... maintenance of a class action is economical and whether the named plaintiffs claim and the class claims are so interrelated that the interests of the class members will be fairly and adequately protected in their absence.’ ” Broussard v. Meineke Discount Muffler Shops, Inc., 155 F.3d 331, 337 (4th Cir.1998) (quoting Gen. Tel. Co. v. Falcon, 457 U.S. 147, 158 n. 13, 102 S.Ct. 2364, 72 L.Ed.2d 740 (1982)). In addition, a class action must satisfy the criteria of Rule 23(b)(1), (b)(2), or (b)(3).
Plaintiffs here have sought certification of a class under Rule 23(b)(3). Because Rule 23(b)(3) is designed for “situations in which ‘class-action treatment is not as clearly called for,’ ” plaintiffs must go beyond satisfying the Rule 23(a) prerequisites and satisfy two additional requirements, “predominance” and “superiority.” Amchem, 521 U.S. at 615, 117 S.Ct. 2231 (quoting Fed.R.Civ.P. 23(b)(3) Advisory Committee Notes). To satisfy the predominance requirement, plaintiffs must show that the “questions of law or fact common to the members of the class predominate over any questions affecting only individual members,” and to satisfy the superiority requirement, they must show that “a class action is superior to other available methods for the fair and efficient adjudication of the controversy.” Fed.R.Civ.P. 23(b)(3). The predominance requirement is “far more demanding” than Rule 23(a)’s commonality requirement and “tests whether proposed classes are sufficiently cohesive to warrant adjudication by representation.” Amchem, 521 U.S. at 623, 117 S.Ct. 2231. Our recent opinions, decided after Amchem, recognize this more demanding standard.
In Broussard, we vacated a judgment against a defendant franchisor and ruled that certification of the franchisee-plaintiff class was error in an action where the franchisees had asserted claims for breach of contract, breach of fiduciary duty, fraud, and negligent misrepresentation, among others. 155 F.3d at 352. Despite our recognition that the district court had exercised its “broad discretion” in deciding to certify the class, we nonetheless decerti-fied the class because the franchisees had not shown that the commonality and typicality requirements of Rule 23(a) were met. Id. at 340-44, 155 F.3d 331. The franchisees were “a hodgepodge of factually as well as legally different plaintiffs”: they signed different contracts with the defendant, relied upon different alleged oral misrepresentations, exhibited varying degrees of reliance upon such misrepresentations, and presented factually different bases for tolling relevant statutes of limitations. Id. at 343. Moreover, the plaintiffs in Broussard alleged damages that were “inherently individualized and thus not easily amenable to class treatment.” Id. at 342. We acknowledged that although the need for mini-trials on damages is not necessarily fatal to class certification, plaintiffs’ claims for lost profits were not a “natural candidate for classwide resolution” because the governing state law required an individual case-by-case analysis of such claims. Id. at 343.
*460 Most recently, in Lienhart v. Dryvit Systems, Inc., 255 F.3d 138, 149 (4th Cir.2001), we held that where “[t]he functional equivalent of a full-blown trial on damages causation for each putative class member would be required to determine to which individuals [the defendant] is liable,” the predominance requirement of Rule 23(b)(3) is not met. This was an application of the principle we elaborated in Windham v. Am. Brands, Inc., 565 F.2d 59 (4th Cir.1977), that pre-dominance may be destroyed when individualized issues regarding damages would require a large number of separate mini-trials. See id. at 69 (“[W]here the issue of damages and impact does not lend itself to such a mechanical calculation, but requires separate mini-trials of an overwhelming large number of individual claims, courts have found that the staggering problems of logistics thus created make (the) damage aspect of the case predominate, and render the case unmanageable as a class action”) (quotation marks and internal citations omitted).
It is against this background that we must consider the class-action certification.
IV
Presented with a seven-count complaint against TPCM and 43 agents, the majority has affirmed the conditional certification of a class of 1,400 insureds and them families against TPCM under Rule 23(c)(4) to answer only “whether TPCM mismanaged the Fund” and “whether TPCM’s mismanagement was a proximate cause of the Plan’s collapse.” Ante at 426-427 (emphasis added).[4] In relying on Rule 23(c)(4) and not the complete analysis of Rule 23(b)(3), the majority fails to answer how these common questions predominate and how this fractured class action advances judicial efficiency. The certified questions do not resolve even a major portion of the issues that must be decided individually, including up to 1,400 mini-trials on damages and causation alongside 1,400 individual full trials on the civil conspiracy claims, RICO claims, and claims under the South Carolina Unfair Trade Practices Act. The majority also concludes that the requirements of Rule 23(a) have been satisfied despite substantial conflicts of interest that are evident based upon the minimal discovery already conducted.
In the majority’s view, this case is a near carbon copy of Central Wesleyan, a nationwide class action against asbestos manufacturers in which we affirmed the conditional certification of a class. In my view, however, the class certified here, unlike the one certified in Central Wesleyan, is a hodgepodge of dissimilarly situated plaintiffs who dealt with the defendants at different times and under different circumstances and who have antagonistic interests. The class here is cobbled together to resolve very little before ultimately relegating the hard questions to individual trials. Although the majority’s effort to fashion a certifiable class under our precedents appears, on the surface, to aid the aggrieved plaintiffs, I believe the majority deviates substantially from the requirements of Rule 23, in the end denying procedural fairness to all of the litigants. I begin by demonstrating the plaintiffs’ most obvious failure — their failure to show that the common questions “predominate over any questions affecting only individual members.” Fed.R.Civ.P. 23(b)(3).
The class as approved by the majority consists of employers, employees, and indi *461 viduals who purchased or used healthcare benefits provided through a Plan sponsored and marketed by the Fidelity Group and related companies over a period of three years. During the course of those three years, claims under the Plan were administered by TPCM during 1996 and part of 1997 and were then administered in-house by Fidelity during the remainder of 1997 until the Plan’s demise in January 1999. Having suffered delayed payment of claims or nonpayment allegedly due to claims mismanagement, with injuries ranging from damaged credit ratings to emotional distress, plaintiffs seek recovery from the administrators of the Plan, the Plan itself, and the 43 agents who sold the Plan. It is the diversity of the factual and legal bases underlying these claims that confounds the plaintiffs’ bold effort to resolve them through the class action process. Indeed, the majority recognizes that the individualized inquiries that pervade plaintiffs’ claims against the individual agents preclude certification of any classes against them. And both the majority and the district court recognized that plaintiffs’ claims based on the South Carolina Unfair Trade Practices Act, RICO, and civil conspiracy must proceed individually. That leaves for potential class certification four of the seven claims against TPCM, which sound in negligence and contract. Yet the evidence that will need to be presented in the class action against TPCM will need to be repeated to some extent in the individual trials against TPCM. For example, the complaint alleges that TPCM, among other defendants, violated the South Carolina Unfair Trade Practices Act by not providing timely coverage and not explaining why payment was delayed. This claim, which must, by statute, be tried individually by each class member, will of course require proof that TPCM was responsible for making payments and did not make such payments to that individual plaintiff in a timely fashion, thereby causing that plaintiff injury. The substantial effort in consolidating the “common question” in this case thus will yield remarkably little in advancing the class members’ individual claims toward a resolution.
The majority is persuaded that, despite all of the differences among the class members that require so many individual trials on the most difficult issues, the common question in the class members’ claims of whether TPCM’s alleged mismanagement of claims “contributed to” or was “a cause” of the Plan’s failure “predominate[s] over any questions affecting only individual members” because Rule 23(c)(4)(A) authorizes the certification of individual issues. But this does not fulfill the requirement that whole “action” be scrutinized to determine whether individual claims predominate.
Although I recognize that many- — but not all — of the class members’ claims require resolution of whether TPCM contributed to the collapse of the Plan, this is an underwhelming commonality in light of the substantial individualized inquiries necessary to determine liability, not to mention damages. If the court proceeds under the class structure as proposed and determines that TPCM’s claims mismanagement was, in fact, a cause of the Plan’s failure, the liability inquiry will only have just begun. The subsequent and more difficult questions, to be litigated individually by class members whose claims were handled either by TPCM or Fidelity between 1996 and 1999, would persist, namely, whether the failure of the Plan caused the class member’s injury and the more complex question of comparative fault.
Although the class as certified presumes a unified group of plaintiffs proceeding on a single legal theory of indirect liability, the complaint for good reasons asserts differing theories of recovery requiring the *462 presentation of different, even conflicting, evidence, which undermines predominance. Specifically, the complaint alleges two theories of liability against TPCM: (1) direct liability, as to those who, for example, suffered injury to credit ratings solely because of a delayed payment during the time TPCM managed claims, and (2) indirect liability, as to those whose claims went unpaid or were paid late by Fidelity as a result of TPCM’s prior claims mismanagement. The majority, recognizing that its “single theory” analysis “appears somewhat at odds” with the complaint and inconveniences its analogy to Central Wesleyan, has apparently accepted an informal disavowal of the direct theory of liability in appellees’ brief. But oral argument clarified that appellees do not disavow anything in their complaint in this regard. At oral argument, appellees’ counsel argued: “There is not a single claim, and they can’t point to one, where we suggest that Third Party Claims Management did anything with any specific claim wrong.” But counsel did not disavow direct liability claims; he simply portrayed direct liability claims as something other than what they are.[5] Counsel’s argument betrays the language of the complaint, which clearly asserts direct claims against TPCM:
Defendant [TPCM] breached their duty [by] ... failing to timely pay claims submitted to them; ... charging fees in excess of what was allowed by agreement; failing to inform plaintiffs and other members of the class of their lack of experience and mismanagement of claims processing; failing to provide plaintiffs and other members of the class with accurate information concerning the status of claims submitted; in other words failing to exercise due care in the processing of claims submitted ...; in providing misleading, false and/or fraudulent information about why claims were not being paid.... As a direct result of Defendants’ negligent conduct, the Plaintiffs have been injured in numerous ways.
These allegations assert direct claims against TPCM based on individual failures that encompass more than the alternative theory of indirect liability flowing from the Plan’s failure.
Because counsel did not disavow the complaint, but simply mischaracterized it, *463 I am unwilling to concede that these claims have been removed from the case. It would be a questionable decision for plaintiffs’ counsel to abandon the theory of liability that best suits an identifiable segment of the certified class. For instance, a class member whose claim was simply delayed, but ultimately paid, in 1996, when TPCM was the sole administrator, would have only a direct claim against TPCM for mismanagement, as the damage to that plaintiff was in no way related to the collapse of the Plan.[6] Jamming these unfortunate class members’ claims into the single-theory class certified here — which purports to proceed only on the theory of indirect liability — not only requires a representative party to shoulder the more attenuated theory of recovery for some of her fellow class members but also actually precludes recovery for those who were in the circumstance where the collapse of the Plan did not cause injury. And even as to class members whose claims were ultimately unpaid, persons who might have a direct claim against TPCM find themselves sacrificed by counsel and caught in a class that requires them to show not only that TPCM mismanaged claims but also that the mismanagement led to the failure of the Plan and that the failure of the Plan caused their injuries. This theory may suit some class members, particularly those whose claims went unpaid by Fidelity after the termination of TPCM’s contract, but it certainly is not fair to all class members. The majority opinion now precludes any recovery by any class member on a direct theory of liability against TPCM, regardless of the merits of their case. Ante at 428, 429-430(“[C]lass claims against TPCM ... rest on a single theory: that TPCM’s mismanagement of claims contributed to the ultimate collapse of the Plan and so caused Plaintiffs’ damage.... [Although] somewhat at odds with the Plaintiffs’ original complaint ... Plaintiffs have made abundantly clear on appeal ... they do not seek class certification for any direct claims against TPCM”).
By accepting the plaintiffs’ mischarac-terization of the complaint — which the majority treats as a disavowal of the direct theory of liability — the majority also tacitly recognizes the conflict that inheres when a single class proceeding on a single theory purports to represent plaintiffs with dissimilar theories of recovery. This court’s response to a complex class action complaint alleging differing theories of recovery should not be to prune allegations and entire theories of recovery until a class remotely certifiable emerges. Cf. Allison, 151 F.3d at 422 n. 17 (“[W]e should not condone a eertification-at-all-costs approach to this case for the simple purpose of forcing a settlement”). Rather, we should take the complaint as written, recognizing that the conflicts and complexities obvious from a plain reading counsel that this case be conducted by individual parties or by such small groups of parties as may be appropriate.[7] In my view, the *464 existence of conflicting theories of recovery not only reveals the plaintiffs’ failure to demonstrate that the common issues predominate but also reveals the inadequacy of a single representative for these disparate theories.
The majority also never addresses the complex question of comparative fault. For example, a class member whose payment was delayed but ultimately paid in 1996, when TPCM was the sole claims administrator, might prove that TPCM’s mismanagement rendered it 100% liable for the class member’s injury, whether it be damage to credit rating or emotional distress. In that case, the failure of the Plan would be irrelevant to the cause of the delayed payment. Another class member, whose payment was delayed or went unpaid in the summer of 1997, shortly after claims management went in-house at Fidelity, might ultimately prove that TPCM was 42% or 70% liable, or even 0% liable if TPCM proved that some independent inadequacy of Fidelity caused a particular claim to go unpaid. Yet another class member, whose claim went unpaid in 1999, almost two years after claims administration went in-house, might be able to prove even lesser responsibility on TPCM’s part. The evidence necessary to establish comparative fault — evidence regarding what TPCM did wrong in a particular case versus what Fidelity did wrong in that case — would require a second presentation during individual trials of much of the evidence, albeit individualized, that the majority believes the certified class structure allows to be presented only once. And, of course, a given class member’s negligence in getting the proper paperwork to the insurer could constitute a cause of delayed payment or nonpayment, which negligence would bar recovery if that negligence exceeded that of the administrator. See Davenport v. Cotton Hope Plantation Horizontal Prop. Regime, 325 S.C. 507, 482 S.E.2d 569, 571 (Ct.App.1997) (“[A] plaintiff in South Carolina may recover only if his negligence does not exceed that of the defendant’s”).
Even apart from the direct-indirect claims problem and the individualized comparative liability questions, which include inquiries into intervening causes of maladministration in particular cases, the individual questions of entitlement to payment under the terms of the Plan and the amount of any such entitlement also loom. This would surely require, among other things, submission of proof relating to timely filing of a claim, proof of medical services rendered, and the like. Indeed, some claimants have had their claims qualified for coverage but not payment, and some have not been qualified for coverage. Those whose claims have been adjudicated may challenge the benefits determination, and TPCM has already indicated that it intends to look at the accuracy of individual claims adjudications, if they will be determinative of liability. Those whose claims have not yet been adjudicated would have to establish the facts that would qualify them for coverage, which would include the nature of the illness or injury for which the claim is made, deductibles and exclusions, doctor documentation, and similar matters. And, of course, as the district court noted, in addition to all of this, “an individualized inquiry is necessary for damages such as damage to one’s credit rating as well as emotional distress and mental anguish.”
*465 It is thus difficult to conceive what advantage is gained by certifying a class premised on such a sliver of commonality. The individualized evidence necessary to determine (1) comparative liability of TPCM versus Fidelity based, in part, on the date the class member (or medical provider) filed a claim, (2) the class member’s (or medical provider’s) negligence, if any, in causing the claim to be delayed or go unpaid, (3) any intervening causes of maladministration, (4) the class member’s entitlement to payment based on the nature of the services received and whether they are covered, (5) the amount of entitlement, considering copayments due, deductibles, and other sources of benefits, and (6) the existence and amount of other damages, such as mental anguish, will surely require presentation of substantially all of the evidence necessary to make the unhelpful determination that TPCM was a cause of the Plan’s failure. And to the extent the Plan’s failure can be shown to be a cause of a class member’s injury— which will not always be the case, of course — there remain questions of whether there were other parties potentially responsible for the Plan’s failure.
Because the complaint alleges seven distinct causes of action and the district court has determined that approximately one-half of these claims will have to be resolved through individual trials, the resulting complexity itself should counsel against class-action treatment. Neither the district court nor the majority have even begun to address how the trials and mini-trials will proceed; how the law of the case or res judicata will be applied; and how evidence will be received when most of it will relate to various individual plaintiffs, individual defendants, and individual claims. The combination of the various trials — up to 1,400 mini-trials, individual full trials as to all defendants on civil conspiracy, RICO violations, and South Carolina statutory violations, and a class-action trial involving the differing claims against TPCM — will produce a hodgepodge of factual findings and legal rulings, perhaps conflicting, that will have to be sorted out and applied either by the jury or by the court as the law of the case. This will create a minefield for legal error.
Given the overwhelming breadth of the issues reserved for separate full trials and individual mini-trials, I conclude that the common issues in this case do not predominate over the individual ones. Amchem, 521 U.S. at 624, 117 S.Ct. 2231 (“Given the greater number of questions peculiar to the several categories of class members, and to individuals within each category, and the significance of those uncommon questions, any overarching dispute about the health consequences of asbestos exposure cannot satisfy the Rule 23(b)(3) predominance standard”).
In addition, the substantial judicial effort required to manage procedurally a case in which the same evidence will be presented to the court both individually and on a classwide basis is not justified by the minimal contribution to the case that an answer to the certified question provides. It is questionable whether, in fact, any time will be saved by certifying the class against TPCM. In any event, the procedural nightmare such a certification invites cannot be thought to come close to satisfying the requirement of Rule 23(b)(3) that the class structure be superior to other available methods of adjudicating the controversy.[8] See Fed.R.Civ.P. 23(b)(3).
*466 Thus, taking the class against TPCM as the district court has defined it in its September 28, 2001 order, one can only conclude (1) that the questions of law or fact common to members of the class do not predominate over the questions affecting individual members and (2) that the class-action process is not superior in this case. The majority’s conclusion to proceed with one or two issues to the contrary, through class treatment under Rule 23(c)(4)(A) in my view, enlarges the reach of Rule 23(b)(3) beyond its proper scope because the constraints of predominance and superiority have not been applied.
I also believe that the class, as conditionally certified, does not satisfy the requirement that the class representatives fairly and adequately protect the interests of all of the class members. See Fed.R.Civ.P. 23(a)(4). In my view, the majority ignores overt conflicts of interest existing among members of the conditionally certified class. Fundamentally, it does not mention or attempt to explain how the conditionally certified class may include, on one hand, employers seeking rescission of the insurance contract and return of the premiums paid, and, on the other hand, employees seeking enforcement of the insurance contract and benefits due under it. In addition to this conflict, the employee class members have potential common-law claims against their employers, who purchased the Plan, for negligence or for misrepresenting the Plan.[9]The incompatible relief sought by the employers and the employees alone precludes adequate representation of both groups by one representative, and this concern is only heightened by the potential for lawsuits by employees against the employers. While the majority addressed only some of the conflicts presented, it gave any notion that conflicts are untenable in class representation the back of its hand.
The district court also recognized some of these conflicts but resolved them only with the observation that they could be cured by the class members’ right to opt out of the class action. But this observation does not address a fundamental defi- *467 cieney of a conflict among class members nor the burden that the plaintiffs must carry in seeking to represent the class as a whole, including those who, for whatever reason, never opt out. Federal Rule of Civil Procedure 23(a)(4) requires plaintiffs, as purported representatives of the class, to demonstrate that they can fairly and adequately protect the claims of class members. They obviously cannot fulfill this responsibility if some class members’ claims are in conflict with others’ claims. See Amchem, 521 U.S. at 626-28, 117 S.Ct. 2231 (finding the plaintiffs could not fairly and adequately represent a class where, within the class, there was a “disparity between the currently injured and exposure-only categories of plaintiffs” making asbestos claims).
Given the relatively insubstantial common issues shared by only some of the class members and the irreconcilable conflicts of interest inhering in the certified class, I do not agree with the majority that this case is “strikingly similar” to Central Wesleyan. Central Wesleyan was an asbestos removal case in which 16-23% of America’s colleges and universities were potential class members and which involved dozens of defendants and hundreds of asbestos products sold over decades. 6 F.3d at 181, 189. The issues conditionally certified for class treatment were “primarily factual,” id. at 189, in a context where “the sheer volume of litigation” in the area impelled many courts nationwide to conclude tentatively that class treatment of certain common factual issues in this very particular type of litigation advanced judicial economy and fostered settlement, id. at 181-83, 185. Conditionally certifying the primarily factual questions for class treatment, the court held, would relieve the colleges and universities of the need “to prove over and over when defendants knew or should have known of asbestos’ hazards, or whether defendants engaged in concerted efforts to conceal this knowledge, or even whether certain of defendants’ products crumble and release dust under hand pressure.” Id. at 185.
This case is unlike Central Wesleyan. This is not a massive nation-wide litigation in which resolving certain primarily factual questions on a classwide basis would substantially reduce repetitive factfinding. The only question certified here is whether TPCM was “a cause” of the Plan’s failure, which is a mixed question of fact and law, and which, as noted, is only the first step in a causation inquiry that is steeped in necessary individualized determinations requiring the presentation of often duplica-tive evidence. While the court in Central Wesleyan countenanced individualized inquiries as to damages, it noted that the potential for individualized inquiries relating to liability could “pose management difficulties and reduce the judicial efficiency sought to be achieved through certification,” indicating that decertification might be warranted. Id. at 189. Here, the need for individualized determinations as to causation is not hypothetical or even unique to a few class members but rather is a characteristic of every claim of every class member.
The complexity of this case counsels that our decisions in Broussard and Lien-hart are far more apt comparisons than Central Wesleyan, portions of which may even have been superseded by the Supreme Court’s analysis in Amchem. In both Broussard and Lienhart, we concluded that the district court abused its discretion in certifying the class. In neither of those actions was there such an array of individual actions that required individual adjudication as those presented in this case. Indeed, in Lienhart we stated that the requirement of individual trials on damages causation alone would require a finding that the predominance require *468 ment of Rule 23(b)(3) was not met. 255 F.3d at 149. The majority glosses over the complexities in this case, overlooking what clearly distinguishes this case from Central Wesleyan.
Rule 23(b)(3) was designed to effect efficiencies without sacrificing procedural fairness. As the Advisory Committee Notes to the 1966 amendments to Rule 23 state:
Subdivision (b)(3) encompasses those cases in which a class action would achieve economies of time, effort, and expense, and promote uniformity of decision as to persons similarly situated, without sacrificing procedural fairness or bringing about other undesirable results.
The drafters of Rule 23 understandably counseled a cautious approach with respect to Rule 23(b)(3) classes, recognizing that even under their limited understanding as to how broadly it might apply, the idea was adventuresome and was not “as clearly called for” as class actions under (b)(1) or (b)(2). See Amchem, 521 U.S. at 615, 117 S.Ct. 2231. This cautious and constricted approach to Rule 23(b)(3) envisioned by its authors should not be relaxed now simply by the passage of time and the additional experience that courts have had with the Rule. Such comfort would tend to transmogrify what is already an adventuresome experiment into one applied for its own sake and not for the sake of procedural efficiency and fairness. As the Court stated in Ortiz v. Fibreboard Corp., 527 U.S. 815, 861, 119 S.Ct. 2295, 144 L.Ed.2d 715 (1999), “we are bound to follow Rule 23 as we understood it upon its adoption, and ... we are not free to alter it except through the process prescribed by Congress in the Rules Enabling Act.” (Emphasis added). Because of its already adventuresome contours, the original understanding of Rule 23(b)(3) class actions clearly contemplated that courts would conduct a “close look at the predominance and superiority criteria.” Amchem, 521 U.S. at 615, 117 S.Ct. 2231. Disapproving any metamorphosis of the rule, the Court stated in Amchem that, while a 23(b)(3) class action was thought to be the most adventuresome innovation of the 1966 amendments, id. at 614, 117 S.Ct. 2231, “[i]n the decades since the 1966 revision of Rule 23, class action practice has become even more ‘adventuresome,’ ” an example of which was before the Court, id. at 617, 117 S.Ct. 2231.
Although the district court’s efforts in patching together a certifiable class against TPCM may be well-intended, energetic, and indeed, even creative, the class is nonetheless far too adventuresome simply to resolve a few common issues, seriously risking the creation of procedural unfairness. Predict as we can how this case might be tried as it is now structured, I see only a queue of problems that sacrifice procedural fairness and have the potential for creating legal error. Without forecasting how the numerous claims might be adjudicated to secure the “just, speedy, and inexpensive determination” of each claim, Fed.R.Civ.P. 1, I conclude that the plaintiffs’ effort to proceed against TPCM under Federal Rule of Civil Procedure 23(b)(3), as certified by the district court in its order of September 28, 2001, is neither “convenient” nor “desirable,” Amchem, 521 U.S. at 615, 117 S.Ct. 2231, and that such a structure amounts to an adventuresome embrace that is too enthusiastic for Rule 23’s possibilities.
Accordingly, I would vacate the entirety of the district court’s order of September 28, 2001, and remand this case for further proceedings.

. For reasons that I explain infra, I would hold that the class certified does not even satisfy the requirements of Rule 23(a) and 23(b)(3).

. At the time of. contract, TPCM’s name was Millennium Healthcare, Inc., and later TPCM was succeeded by Healthplan Services, Inc. For convenience, I refer to any or all of these entities collectively as “TPCM.”

. The Fidelity defendants include the Fidelity Group, NABOP, the union that it formed, the Plan, Fidelity Claims Management, and involved executives and employees.

. The majority’s evolving definition of the certified issue now also includes “whether the Fidelity Defendants” — who are not a party to the class that was certified — "also mismanaged the Fund, and whether the Fidelity Defendants’ mismanagement was an intervening cause of the Plan's collapse sufficient to relieve TPCM of liability.” Ante at 426-427.

. Questioning by the court at oral argument revealed that plaintiffs’ counsel was not disavowing anything in the complaint, but rather making the demonstrably false argument that the complaint never alleged any direct theory of liability against TPCM:
Judge Motz: You have a direct argument when TPCM is still in there.
Counsel: Your Honor, we're not making that argument at all.
Judge Motz: Okay, so you’re disavowing that argument.
Counsel: We never made that argument.
By embracing a disavowal that even plaintiffs’ counsel disclaimed he was making, the majority leaves the plaintiffs with only direct liability claims against TPCM out in the cold. As the majority points out, the South Carolina statute of limitations appears to have run on actions for breach of contract and fraud, ante at 431. That leaves these plaintiffs who cannot — or prefer not to — proceed on an indirect liability theory to file their own individual actions, and exposes them to arguments that their claims are now untimely. Although equitable tolling might arguably rescue these unwanted plaintiffs from having their claims dismissed, the need potentially to employ such an extraordinary measure only bespeaks the peculiarity of the majority’s cutting these plaintiffs’ claims out of the complaint to certify the surviving allegations. Perhaps recognizing the severity of holding that the plaintiffs do not assert direct claims, the majority now alternatively states that the plaintiffs "do not seek class certification for any direct claims against TPCM,” but this conclusion, too, flies in the face of the complaint and the motion for class certification, both of which seek certification of all claims against TPCM. The direct claims quite clearly inconvenience the majority’s analysis.

. Indeed, counsel’s reluctance to pursue both direct and indirect claims suggests their inability to represent absent class members whose only claims are direct claims.

. The majority’s treatment of the plainly pleaded direct theory of liability is mystifying. Perplexingly, the majority relies upon the liberal theory of pleadings to justify its excision of a pleaded theory of liability from the complaint, seemingly for the convenience of its certification analysis. Ante at 429-430. Having excised that theory of liability from the complaint, the majority then treats with indignation what it calls my "disingenuous” suggestion that rewriting the complaint has done a disservice to an identifiable group of plaintiffs. Ante at 432 n. 8. Making reference to exceptions to claim-splitting and the opt-out feature of Rule 23 to surround its selective redrafting of the complaint in an air of legitimacy, the majority does little to address why it is fair to any plaintiff to excise a timely *464 pleaded theory of recovery from the complaint, leaving any plaintiffs wishing to assert the theory they thought they had alleged to plead it anew, albeit now likely untimely. I would rather give the plaintiffs the benefit of the fullness of their claims as timely plead, in accordance with the liberal theory of pleadings.

. The majority finds comfort in running to the "conditional” aspect of certification, stating that "we are only approving a conditional certification of the case, and ... in the unlikely event the case becomes a 'procedural morass,’ ... we are confident that the district *466 court will ... decertify the class.” Ante at 445. This view defaults our responsibility and employs a backward burden in demonstrating the superiority of the class action device. The majority apparently believes that no matter how complex, a complaint comes to the court bearing an entitlement to certification unless the court can prove why it should not be certified. This view is reflected in the court's willingness to excise inconvenient theories of recovery from the complaint and its willingness to elevate Rule 23(c)(4) to allow certification of any common issue, presumably subject to some unspoken limiting principle. But the fact remains that a class action is an "exception to the usual rule” that litigation is to be pursued by the individual parties, Califano, 442 U.S. at 700-01, 99 S.Ct. 2545 (emphasis added), that the party seeking certification bears the burden of proving satisfaction of the class-qualifying criteria of Rule 23(a) and (b), and that the court is to measure plaintiff's ability to meet that burden against the action as alleged in the complaint. The alternative I suggest, therefore, is that this case proceed according to the usual rule that the claims be asserted by the individual named parties, and I note the availability of our rules of civil procedure to achieve economy even without a class action. See Benjamin Kaplan, Continuing Work of the Civil Committee: 1966 Amendments of the Federal Rules of Civil Procedure (I), 81 Harv. L.Rev. 356, 391 (1967)("[T]he procedural alternatives are hardly confined to the class action, on the one side, and the individual uncoordinated lawsuits, on the other; there are often other possibilities ranging from use of a model action to consolidation or coordination of the numerous individual actions for all or selection purposes”) (citation omitted).

. It may well be, as the majority notes, that many of the claims the employees may have against their employers are now barred by the statute of limitations, depending on what theory of when a third-party claim accrues is applied.